W. T. Scott v. The Bankers' Union of the World *et al.*

No. 14,516.    (85 Pac. 604.)

SYLLABUS BY THE COURT.

1. CORPORATIONS — *Fraternal-insurance Association — Power to Issue Notes.* An incorporated fraternal-insurance association, organized under a charter which does not expressly confer the power to issue promissory notes, has no implied power to do so, when such authority is unnecessary to enable the association to exercise the powers expressly given or to accomplish the purpose of its creation.

2. ——— *Dealings with a Corporation—Notice of its Powers.* Every person dealing with a corporation or with its obliga-

tions is bound to take notice of the power possessed by such corporation and of the purpose for which it was created.

3. —— *Bona Fide Purchaser of Ultra Vires Corporate Note.* The purchaser of a promissory note executed by a corporation not having the legal power to issue such an obligation cannot recover thereon from such maker, even when the note is taken in good faith and for value.

4. —— *Incapacity of Corporation Does Not Release the Other Joint Maker.* A person who is the joint maker of a promissory note with a corporation which does not have the power to issue such an obligation may be liable thereon to an innocent holder thereof, even though no recovery can be had against the corporation.

Error from Shawnee district court; Z. T. HAZEN, judge. Opinion filed May 12, 1906. Modified.

STATEMENT.

IN 1901 the Bankers' Union of the World was a fraternal beneficiary association, organized under the laws of the state of Nebraska. Its principal officers were E. C. Spinney, president, and C. M. Chittenden, secretary. At that time the National Aid Association was also a fraternal beneficiary association located in Topeka, Kan.; and its principal officers were L. R. Lewis, president, S. D. Cooley, secretary, and M. Ware, medical director.

The National Aid Association was very much reduced financially, having about $100 in its mortuary fund and about $2400 in its expense fund. It owed its officers nearly $5000 for past-due salaries, and there were claims due against its mortuary fund aggregating $34,330. The officers of these associations held a conference in October, 1901, for the purpose of effecting a consolidation of the organizations. Arrangements were considered, and written agreements signed, which were satisfactory to the officers. Efforts were then made by them to obtain the consent of the associations to the plans which had been agreed upon.

The board of directors of the Bankers' Union of the

World, which had all the power legally conferred upon the association, authorized its president, E. C. Spinney, on October 23, 1901, to make such arrangements as "he deems necessary and proper to effect such consolidation." In pursuance of this authority E. C. Spinney confirmed the former arrangements made with the officers of the National Aid Association, whereby it had been agreed between them that Lewis, Cooley and Ware should use their influence in securing a transfer of the management of the National Aid Association to the management of the Bankers' Union of the World; that they should surrender all claims, for back salary and otherwise, held by them against the National Aid Association, and assist as far as possible in obtaining the final amalgamation of the two orders; in consideration whereof the Bankers' Union of the World agreed to assume the liabilities of the other association, not exceeding the sum of $34,330, and pay to said Lewis, Cooley and Ware the sum of $10,000 in thirty equal monthly instalments, beginning November 1, 1901, if the consolidation was completed at that time, and if not, then on the first day of the next month after it was completed. These instalments were each evidenced by a promissory note executed by the Bankers' Union of the World, by its president, E. C. Spinney, and by him personally. Ten of these promissory notes were made payable to the order of Ware, and the same number to each of the other obligees—Lewis and Cooley. The notes were in all respects negotiable in form.

In furtherance of this arrangement Lewis and Cooley called a meeting of the directors of the National Aid Association, resigned from their positions as president and secretary of the order, and to fill the vacancies made by such resignations the directors elected Spinney and Chittenden, who at once assumed the management and control of that association. Afterward a meeting of delegates sent from the subordinate lodges

37—73 KAN.

of the National Aid Association throughout the country met at Topeka, Kan., and after full discussion thereof ratified and confirmed the acts which had been done in the direction of a consolidation of the associations, and ordered that proper steps be taken to complete such arrangements.

Spinney and Chittenden managed the National Aid Association as a separate organization until December 15, 1901, when they resigned, and the management devolved upon Elsie Buckman, acting secretary, who conducted the affairs of the order until January 8, 1902, when it passed into the hands of a receiver.

The promissory notes held by Lewis, Cooley and Ware which fell due November 1, 1901, were paid by Spinney, with checks drawn upon the funds of the National Aid Association. The notes which matured December 1, 1901, were not paid when due, and suit was brought thereon, but Spinney afterward settled the suit and paid the notes.

As a result of the attempted consolidation, the Bankers' Union of the World received nothing; its officers, E. C. Spinney and C. M. Chittenden, received nothing. The National Aid Association received nothing; its officers, Lewis, Cooley, and Ware, received the notes as above stated. In the transaction, however, they had resigned their offices, and faithfully worked to accomplish the purpose in view, as agreed by them.

M. Ware, the payee and holder of eight of the notes above mentioned, exchanged them for the home farm and the live stock thereon of the plaintiff herein. This farm is located in Hodgeman county, Kansas. The plaintiff gave to Ware a bond for a deed to the real estate, a bill of sale for the stock, and agreed to retain possession thereof and care for the same one year. On January 2, 1902, suit was brought on the note which became due January 1, 1902, and afterward by stipulation the other notes were added, so that this suit embraces the eight notes of $333.33 each. The plaintiff

still retains possession of all the property deeded to Ware. The plaintiff took the notes in good faith, for full value, and without notice of the circumstances under which they were executed.

The Bankers' Union of the World was organized under the provisions of chapter 47 of the Laws of Nebraska of 1897. The title of the act contains the following: "An act defining fraternal beneficiary societies, orders or associations, and regulating the same, and to repeal," etc. The act in part provided:

"SECTION 1. A fraternal beneficiary association is hereby declared to be a corporation, society or voluntary association, formed or organized and carried on for the sole benefit of its members and their beneficiaries, and not for profit. Each such society shall have a lodge system, with ritualistic form of work and representative form of government.

"SEC. 2. Such society shall make provision for the payment of benefits in case of death; . . . provided, the payment of such benefits in all cases shall be subject to compliance, by the member, with the contract, constitution, rules and laws of the society.

"SEC. 3. The fund from which the payment of such benefits shall be made, and the fund from which the expenses of such society shall be defrayed, shall be derived from beneficiary calls, assessments, or dues collected from its members."

Section 4 defines who may be beneficiaries.

"SEC. 5. Such societies shall be governed by this act and shall be exempt from the provisions of the statutes of this state relating to life-insurance companies except as hereinafter provided, and no law hereafter passed shall apply to them unless they be expressly designated therein."

Section 6 defines where such associations may be served. Section 7 exempts the proceeds of a beneficiary certificate for debts of holder. Sections 8 and 9 provide the steps to be taken to obtain a permit to do business under this act. Section 10 provides reports to be made to the auditor of public accounts. Section 11 requires foreign associations doing business under

this act to appoint a person upon whom service may be made. Section 12 provides terms upon which such orders may do business in the state. Section 13 limits the right to solicit membership. Section 14 concerns contracts between a beneficiary and a member whereby the former is to pay the latter's dues. Section 15 permits transaction of business outside the state. Sections 16, 17 and 18 recite causes which forfeit the right to do business and provide penalties for violations of the statute. Section 19 requires examination of members by physician. Section 20 provides for the organization of new corporations under the act.

"SEC. 21. All societies, orders and associations contemplated in this act shall be exempt from the provisions of chapter 16 of the Compiled Statutes of 1885. . . . The moneys collected by any such society from its members, according to the plan or method provided in its constitution and by-laws, for the payment of death or disability claims arising under the terms of its beneficiary certificates, shall be kept separate and apart from the other funds of such society, and shall be used only in payment of such claims, and no part thereof shall be used by such society in payment of expenses of any kind or character."

Section 22 requires a copy of the constitution and by-laws to be filed with auditor. The constitution of the Bankers' Union of the World contains, *inter alia*, the following provisions:

"DIVISION 1.

"SEC. E.    *How maintained.*—The expense of the fraternity shall be defrayed by a percentage of the premium income, per capita tax and membership and certificate fee upon every member thereof. The same shall be collected and forwarded to the Bankers' Union of the World by the subordinate lodges, and shall be placed in the designated funds. The amount available for general fund for expenses and the membership fees shall be established by the board of directors, but the amount of premium income so available shall not, after the first year of each policy, exceed the ratio of three dollars per $1000 of life-insurance on a single policy, and a ratio of four dollars and fifty cents per

$1000 in case of a joint policy, or a ratio of three dollars for each accident policy of the lowest amount provided for, all calculated per annum. To meet this expense the first premiums received on each policy by said Bankers' Union of the World shall be available till said limit is reached."

"DIVISION 4.

"SEC. F. *Duties of the supreme banker.*—The supreme banker shall receive all money belonging to the general, reserve and benefit funds of the order, and shall give a receipt when each payment is received. . . . He shall pay all orders on the reserve, benefit and general funds, signed by the supreme president and attested by the supreme secretary, keeping a separate account with each of the three funds."

"SEC. H. *Duties of board of directors.*—The board of directors shall have complete control of the financial affairs of the fraternity, shall protect the charter of the same and exercise its corporate powers as provided by the laws of the state of Nebraska. . . . It shall be the duty of the board of directors: . . . (3) *Payment of claims.*—To authorize and order payment of all proper claims against the fraternity, and direct payments to be made from the general fund of such as may be properly paid therefrom. (4) . . . The supreme secretary shall not issue any order on the supreme banker for the payment of any claims unless such order shall have been first signed by the supreme president."

By sections I, J, and K, the general manager is authorized to publish an official paper for the membership, and to employ an attorney when necessary, compensation in each case to be fixed by the general manager.

"DIVISION 9.

"SEC. D. *Reserve fund.*—For the purpose of creating a reserve fund, to guard against poor risks, protect healthy members, equalize the cost to all, and absolutely insure the perpetuity of the union, all insurance in the Bankers' Union of the World will be adjusted and paid on the following plan: Should any member holding a policy die before having lived out his expectancy of life based on his age at entry according to the American experience table of mortality, there shall

be deducted from the death benefit payable under such policy held by said member a sum equal to the amount of one payment (at the rate paid by the member) for each month of the unexpired period of such life expectancy, with four per cent. on the unpaid balance of such sum. Accident and disability benefits payable under all policies shall be subject to proportionate deduction. All such deduction made in payment of policies at times when the mortuary fund equals or exceeds $10,000 over and above all claims on file and approved against said mortuary fund shall constitute a reserve fund. All such deductions in payment of policies made at times when the mortuary fund amounts to less than $10,000 over and above all claims on file and approved against said fund shall be placed in the mortuary fund of the company. The reserve fund of the Bankers' Union of the World shall not, under any circumstances, be used for any purpose except to meet death losses in excess of six deaths per thousand members per year, and for the payment of old-age benefits to members over seventy years of age. It is declared to be the fundamental principle and policy of this union that no more than twelve premiums at the rate at entrance age shall be made in any one year for the payment of mortuary, disability and accident benefits and expenses of the union. But if for any cause now unforeseen and not anticipated the rate fixed at entrance according to age fails to produce the necessary amount, then it shall be the duty of the board of directors to order a special call, which shall be paid by each member to the secretary of his or her subordinate lodge within thirty days from the date of such call, which funds shall forthwith be transmitted by such secretary to the Bankers' Union of the World. Members failing to pay any special call within thirty days from the date of the said call of the same shall stand suspended."

Section A of division 1 of the by-laws provides, in substance, that the supreme lodge shall have exclusive charge of printing and furnishing lodge supplies, at prices fixed by the directors, the proceeds to go into the general fund of the supreme lodge.

In addition to the foregoing there are many other expenses provided for which are necessary to the ex-

istence of the order, and which it is necessary to pay out of the funds of the association.

E. C. Spinney is joint maker of the notes sued on with the Bankers' Union of the World, of which he was president. A copy of the note upon which suit was instituted is as follows:

"OMAHA, NEB., October 26, 1901.

"January 1, 1902, after date, for value received, we promise to pay to the order of M. Ware, at the office of Stebbins & Evans, 509 Kansas avenue, Topeka, Kan., three hundred and thirty-three dollars and thirty-three cents; interest at ten per cent. per annum after due until paid.

(Signed)    THE BANKERS' UNION OF THE WORLD.
            By E. C. SPINNEY, *President and General M.*
            E. C. SPINNEY."

Indorsed as follows: "Pay to the order of W. T. Scott.                    (Signed)       M. WARE."

*Overmyer & Overmyer,* for plaintiff in error.

*Edwin A. Austin,* and *Otis E. Hungate,* for defendants in error.

The opinion of the court was delivered by

GRAVES, J.: This action was commenced to recover upon the eight promissory notes obtained by the plaintiff from M. Ware, each being for the sum of $333.33. The notes were given in consideration of services performed in an effort to effect a consolidation of the Bankers' Union of the World and the National Aid Association. One of the defendants, the Bankers' Union of the World, objects to the payment of the notes (1) because the purpose for which the notes were given was beyond the power of the association, which makes them void *in toto;* and (2) because the plaintiff is not in a position to claim the protection ordinarily due to an innocent holder of commercial paper, as he is still in possession of all the property that was the consideration for the notes and is secure from loss without such protection.

The plaintiff insists that a corporation having power to create debts or incur liabilities for any purpose whatever has the power to issue its promissory note therefor, and the purchaser of such note, in the absence of notice or knowledge to the contrary, has the right to assume that it was given for a rightful purpose; that defendant association has express power to provide many things that can only be obtained either by cash or credit, and to carry out the manifest purposes of the order it is necessary for it to have the power to contract debts for these essential purposes and issue its promissory notes therefor; that the plaintiff has delivered all of the property sold, and is in possession thereof merely as agent of the owner, and therefore cannot protect himself; and, further, that the defendant association, having received the services of the payee of the notes, and caused him to surrender his office, and receipt for past-due salary, is now estopped from denying its power to make the contract and execute the notes.

There are other questions presented, but they are minor to, and involved in, the principal ones mentioned, and in the view we have taken they are not material to the conclusion reached and need not be considered.

Corporations are created by law, and have such powers only as are expressly or impliedly conferred upon them. The charter of a corporation is the measure of its power. (7 A. & E. Encycl. of L. 695.) In the case of *Head v. Providence Insurance Co.*, 6 U. S. 127 (reprint, vols. 5-6, p. 150), 2 L. Ed. 229, Chief Justice Marshall said:

"Without ascribing to this body, which in its corporate capacity is the mere creature of the act to which it owes its existence, all the qualities and disabilities annexed by the common law to ancient institutions of this sort, it may correctly be said to be precisely what the incorporating act has made it; to derive all its powers from that act, and to be capable of exerting

its faculties only in the manner which that act authorizes. To this source of its being, then, we must recur to ascertain its powers." (Reprint, vols. 5-6, p. 154.)

In the case of *N. Y. F. Ins. Co. v. Ely*, 5 Conn. 560, 567, 13 Am. Dec. 100, Chief Justice Hosmer said, when speaking of the powers of corporations, that "the law of its nature, or its birthright, in the most comprehensive sense, is such, and such only, as its charter confers." In the case of *Central Transp. Co. v. Pullman's Car Co.*, 139 U. S. 24, 11 Sup. Ct. 484, 35 L. Ed. 55, Mr. Justice Gray said:

"The charter of a corporation, read in the light of any general laws which are applicable, is the measure of its powers, and the enumeration of those powers implies the exclusion of all others not fairly incidental." (Page 48.)

This is the generally accepted and recognized rule. The implied powers which a corporation has are only such as are necessary fully to carry out the powers expressly given and to accomplish the purpose of its creation. (7 A. & E. Encycl. of L. 699; *The People, ex rel., v. Chicago Gas Trust Co.*, 130 Ill. 268, 283, 22 N. E. 798, 8 L. R. A. 497, 17 Am. St. Rep. 319; *Chicago Gas Light Co. v. People's Gas Light Co.*, 121 Ill. 530, 13 N. E. 169, 2 Am. St. Rep. 124; *Franklin Bank v. Commercial Bank*, 36 Ohio St. 350, 355, 38 Am. Rep. 594.)

In the case of *National Home-building Ass'n v. Bank*, 181 Ill. 35, 54 N. E. 619, 64 L. R. A. 399, 72 Am. St. Rep. 245, Chief Justice Cartwright said:

"A corporation is a creature of the law, having no powers but those which the law has conferred upon it. A corporation has no natural rights or capacities, such as an individual or an ordinary partnership, and if a power is claimed for it the words giving the power or from which it is necessarily implied must be found in the charter or it does not exist." (Page 40.)

It may therefore be said that as a general rule a private corporation possessing the powers usually con-

ferred has authority to issue promissory notes, either when authorized to do so in express terms, or when it is necessary to carry out other powers expressly given and is essential to the accomplishment of the purpose of its creation. But it may also be said that corporations may be created which do not have such power, either express or implied. Whether a given corporation has such power or not will depend upon the express provisions of its charter, and the purpose it was intended to accomplish. When a law whereby a corporation is created does not confer in express terms the power to issue promissory notes, such power will not be implied if it appears from the general scope of the law, and from the purpose to be accomplished by such corporation, that it is not essential to the proper exercise of the powers expressly conferred nor to the accomplishment of the objects for which the corporation was created.

Applying these principles to this case, we have concluded that the Bankers' Union of the World did not have power, either express or implied, to issue the notes sued upon. It was organized under the provisions of a statute enacted for the purpose of placing such associations in a separate and distinct class. By the express terms of this statute associations organized under it are excluded from the provisions of all laws relating to ordinary corporations and life-insurance companies. This indicates an intention to deprive them of the ordinary business powers incident to other corporations, and to withhold all power not expressly given.

This association was not organized for trading or business purposes, or to acquire profit in any way. It is without capital, and has no revenue. Its only financial resource is the voluntary contributions of its members. Its only business is to receive and disburse these contributions in accordance with the rules of the order. No power exists to enforce the payment of as-

sessments, but when they are voluntarily paid a fixed per cent. thereof is placed in a fund out of which all the expenses incident to the management of the order are to be paid. This fund is the sole means at the disposal of the officers of the association, and it is, and of necessity must be, an uncertain and conjectural quantity. The issuance of a promissory note, with no security for payment when due other than this fund, would be a very unbusinesslike transaction. It would seem like folly to permit any obligation of the association to be issued which exceeded the extent of this fund at the time of such issuance. An obligation payable upon the contingency that this fund would be sufficient might work no injury, but a promissory note negotiable in a commercial sense, payable absolutely, is wholly incompatible with the plans, resources and necessities of such an organization.

A law permitting a corporation of this character to issue such notes, and thereby deceive and entrap the unwary and credulous, would be open to serious criticism. It may be conceded that the legislature of Nebraska might confer such power upon such an association, but it should not be assumed to have done so until its language to that effect is so clear and explicit as to admit of no other reasonable interpretation. The statute under which the Bankers' Union of the World was organized, and the constitution and by-laws of that order, have been fully pleaded and constitute a part of the record in this case. The decisions of the Nebraska supreme court, so far as deemed applicable, have been cited in the briefs of counsel, and further to aid this court depositions of eminent lawyers in that state have been taken, wherein opinions have been given *pro* and *con* as to whether or not under this statute and the decisions and other laws existing in Nebraska the Bankers' Union of the World had the legal power to issue a promissory note. But, since we have the statute and reports before us, we have con-

cluded to follow our own judgment in the decision of this question.

It is familiar law that whoever deals with a corporation or buys its obligations is bound to take notice of the powers conferred by its charter, and the purposes for which it was created. When the plaintiff was about to purchase the notes in question he was charged with notice of the powers, express and implied, possessed by the Bankers' Union of the World, and was bound to take notice that it had no authority or power to issue such notes for any purpose whatever. Charged with such notice, he could not become the owner of the notes so as to be entitled to the protection usually accorded an innocent holder of commercial paper. (*Alexander et al. v. Cauldwell et al.*, 83 N. Y. 480, 485; *Jemison et al. v. C. S. Bank*, 122 N. Y. 135, 140, 25 N. E. 264, 9 L. R. A. 708, 19 Am. St. Rep. 482; *Sturdevant Bros. & Co. v. Farmers' & Merchants' Bank of Rushville*, 69 Neb. 220, 95 N. W. 819; *National Home-building Ass'n v. Bank*, 181 Ill. 35, 54 N. E. 619, 64 L. R. A. 399, 72 Am. St. Rep. 245; *Nicollet National Bank v. Frisk-Turner Co.*, 71 Minn. 413, 74 N. W. 160, 70 Am. St. Rep. 334; *The Franklin National Bank et al. v. Whitehead et al.*, 149 Ind. 560, 49 N. E. 592, 39 L. R. A. 725, 63 Am. St. Rep. 302; *Durkee v. The People*, 155 Ill. 354, 40 N. E. 626, 46 Am. St. Rep. 340.)

This conclusion disposes of the case so far as the Bankers' Union of the World is concerned, and makes it unnecessary to consider the question of estoppel on account of benefits received, as the plaintiff took the notes with notice of this infirmity and is not therefore entitled to the rights of an innocent holder. It seems, however, that this defendant received very little, if anything, of value out of the transaction. The scheme of consolidation failed. These notes were not to be paid unless it succeeded. It is true that the president and secretary of the Bankers' Union of the World, while in control of the National Aid Association, used

its funds in a way that might give just cause of complaint, but that association is not in this case. These funds were not transferred to the Bankers.' Union of the World, nor used in any way for its direct benefit. They were used to defray the expense incurred in the furtherance of the scheme in which both associations were interested. The National Aid Association was insolvent and unable to pay the salaries due its officers, and the release thereof resulted in very little, if any, loss to them, and no advantage to the other association.

We think E. C. Spinney, the other maker of these notes, is liable thereon. He was personally, as well as officially, interested in securing the consolidation of the associations. But for his supposed personal financial responsibility nothing would have been done by the payees of the notes to secure the union of the two companies. He knowingly and voluntarily executed negotiable notes, and consented to their delivery. The transaction in which they were given was not unlawful, or contrary to public policy. The consolidation of such corporations might be desirable and useful to both associations, and proper and legitimate in every way. The officers of the National Aid Association did not attempt to sell out their company, nor to betray their trust; they only undertook to advise with and urge the subordinate lodges and members to consent to the proposed merger. This was proper. The National Aid Association could not exist alone very long, and any change which promised protection to its certificate holders was desirable. We think this effort on the part of the officers was not vicious, but commendable.

The notes are not enforceable against the other maker (the defendant corporation) simply because it had no power to execute them, and the plaintiff had legal notice thereof when he took them. The plaintiff, having bought these notes in good faith, and for value, and without notice of the circumstances under which they were given, is an innocent holder as against Spinney, and is entitled to recover thereon.

The judgment of the district court is affirmed so far as the Bankers' Union of the World is concerned, and reversed as to E. C. Spinney; and it is directed to enter judgment, upon the facts found by it, against E. C. Spinney, in accordance with the views herein expressed. The costs in this court are divided equally between the plaintiff and defendant Spinney.

All the Justices concurring.