M. WARE v. EDMUND C. SPINNEY.

No. 15,129.   (91 Pac. 787.)

SYLLABUS BY THE COURT.

PRINCIPAL AND AGENT — *Illegal Agreement — Accounting for Money Not Expended.* A principal who places money in the hands of an agent to be disbursed to others for an illegal purpose does not necessarily forfeit his right to such money, but may require the agent to account to him for so much of it as has not been expended or appropriated to the unlawful purpose.

Error from Shawnee district court; ALSTON W. DANA, judge. Opinion filed July 5, 1907. Affirmed.

STATEMENT.

THIS is an action to recover $2500 given by Edmund C. Spinney to M. Ware for the alleged purpose of paying the necessary expenses incident to the convening of the board of directors of the National Aid Association, but which, it was alleged, was not used for that purpose and Ware had refused to account for or return upon demand.

Ware's answer was a general denial. On the trial it was shown that $150 was first paid, and later a payment of $2350 was made, when the following receipt was given:

"TOPEKA, KAN., October 25, 1901.

"Received of E. C. Spinney, twenty-three hundred and fifty ($2350), to be used to pay necessary expenses

19—76 KAN.

of combining the management of the National Aid Association and the Bankers' Union of the World, as per contract, if such combination shall be effected, and to be returned to said E. C. Spinney in case it is not.

(Signed)        M. WARE.
                S. D. COOLEY."

The preliminary agreement is as follows:

"October 12, 1901.

"Memorandum of agreement between L. K. Lewis, president, S. D. Cooley, secretary, M. Ware, medical director, Harry Wright, director, and the National Aid Association, and E. C. Spinney, president and general manager of the Bankers' Union of the World:

"(1) Cooley, Lewis, Ware and Wright agree to work faithfully to secure a combination and amalgamation of the National Aid and the Bankers' Union of the World.

"(2) Spinney and the Bankers' Union of the World agree to pay Lewis, Cooley, Ware, $12,500, as follows: $2500 as needed, subject to Ware's check, and $10,000 —$1000 a month.

"(3) Liabilities of which the National Aid has official notice not exceeding $27,330 uncontested, and $7000 contested, to be assumed and agreed to be paid by the Bankers' Union of the World and Spinney, according to constitution and by-laws of the National Aid.

"(4) National Aid to turn over office furniture and supplies, but no money except $1300 with National Security Company.

"(5) Pt. and secy. personally gt. that official notice has not been received of liabilities in excess of the amounts here named.

"(6) Spinney to pay all expenses directors coming together if deal fails, not exceeding $150.

L. K. LEWIS, *Pres.*
S. D. COOLEY, *Secy.*
M. WARE, *Med. Dir.*
HARRY WRIGHT, *Director.*
BANKERS' UNION OF THE WORLD,
By E. C. SPINNEY, *Pres. and Gen. M.*"

In the formal agreement subsequently made, signed by the officers of the two organizations, and providing

Ware v. Spinney.

for their consolidation, the following stipulations were made concerning the money in question:

"(3) The said E. C. Spinney and the Bankers' Union of the World, upon their part, agree to pay to the said Lewis, Cooley, Ware and Wright, to defray the necessary expenses of the consummation of the said consolidation, the sum of twenty-five hundred dollars, as the same shall be needed, which sum shall be subject to the check of the said M. Ware. In the event that the said Lewis, Cooley, Ware and Wright shall earnestly and faithfully do all in their power to consummate said consolidation, and shall, through no fault of theirs or either of them, fail therein, then, and in that event, the said E. C. Spinney and the said Bankers' Union shall pay only one-half of the expenses of convening the said board of directors of the said association, which in no event shall exceed three hundred dollars, one-half thereof, one hundred and fifty dollars, to be paid by the said E. C. Spinney."

In the same contract was a provision to pay Lewis, Cooley and Ware the sum of $10,000, in thirty equal monthly instalments, which instalments were evidenced by promissory notes of the Bankers' Union, by E. C. Spinney, as president and also personally. These notes became the subject of controversy between the Bankers' Union and W. T. Scott, an assignee of Ware, in which it was held that the Bankers' Union was not bound by the notes but that Spinney was personally liable for their payment. (*Scott v. Bankers' Union,* 73 Kan. 575, 85 Pac. 604; *Bankers' Union v. Crawford,* 67 Kan. 449, 73 Pac. 79, 100 Am. St. Rep. 465.)

Upon all the testimony in the case the court specially found:

"(1) The defendant and S. D. Cooley received from L. A. Stebbins the sum of $150, paid to him by the plaintiff by his check of October 12, 1901.

"(2) The $150 referred to in finding No. 1 was used and applied by S. D. Cooley in part payment of the expenses of holding the directors' meeting of October 26, 1901, of the board of directors of the National Aid Association.

"(3) The balance of the expenses of the directors' meeting mentioned in the second finding herein was paid by S. D. Cooley, with the funds of the National Aid Association.

"(3½) That on October 26, 1901, the plaintiff deposited in the Central National Bank of Topeka, Kansas, a draft or check drawn by the Bankers' Union of the World on a bank in Omaha for $1400 and a check drawn by the plaintiff on a bank in Omaha for $1000, and accepted in lieu thereof a deposit slip or ticket showing that the plaintiff had deposited to the credit of M. Ware $2350 and $50 in cash; that said money was received by said defendant as bailee to disburse to others in behalf of the plaintiff.

"(4) The defendant received the $2350 deposited by plaintiff in the Central National Bank to the credit of said M. Ware on October 26, 1901.

"(4½) The court finds from the evidence that the purpose for which the money in controversy was delivered to and placed in the hands of defendant was to bring about, effect and consummate a combination and consolidation of the National Aid Association, a fraternal beneficiary association, being a corporation organized under the laws of the state of Kansas, and the Bankers' Union of the World, a fraternal beneficiary association, being a corporation organized under the laws of the state of Nebraska, in pursuance of and as provided in the written memorandum of agreement of October 12, 1901, in evidence herein, as supplemented by the written contract of October 26, 1901, in evidence herein.

"(5) No part of said $2350 deposited by the plaintiff in the Central National Bank to the credit of said M. Ware on October 26, 1901, was used in paying the necessary expenses of holding the directors' meeting of the board of directors of the National Aid Association of October 26, 1901.

"(6) The directors' meeting of the board of directors of the National Aid Association of October 26, 1901, was called and held for the purpose of combining the management of the National Aid Association and the Bankers' Union of the World.

"(7) The combining the management of the National Aid Association and the Bankers' Union of the World contemplated was effected by the resignation of

the officers of the National Aid Association and the election of such officers in their stead of persons holding the managing offices of the Bankers' Union of the World, and such resignation, election and substitution was fully effected by the action of the directors' meeting of the board of directors of the National Aid Association of October 26, 1901.

"(8)  The management of the National Aid Association and the Bankers' Union of the World was combined by the action of the directors' meeting of October 26, 1901, of the board of directors of the National Aid Association.

"(9)  None of the disbursements by the defendant of the $2350 received by him from the plaintiff by the deposit in the Central National Bank to the credit of said M. Ware was for the necessary expenses of combining the management of the National Aid Association and the Bankers' Union of the World, other than the $670 paid Harry Wright and the $30 paid for the banquet at the Hotel Throop.

"(10)  The plaintiff demanded of defendant the money remaining in his hands and not used in paying the necessary expenses of combining the management of the National Aid Association and the Bankers' Union of the World before the commencement of this action.

"(10½)  That said defendant did not comply with the demand made upon him by the plaintiff, and has not accounted for $1650 remaining of the $2350 so received by him, after paying H. Wright $670, and after paying $30 for the banquet at the Hotel Throop."

"CONCLUSION OF LAW.

"Plaintiff is entitled to judgment against defendant for $1650, with interest at six per cent. from November 26, 1901."

Judgment was accordingly entered, of which Ware complains.

*Frank Doster,* and *George E. Overmyer,* for plaintiff in error.

*Edwin A. Austin,* for defendant in error.

The opinion of the court was delivered by

JOHNSTON, C. J.: The error assigned by Ware is that the judgment of the trial court was against the law and the evidence and contrary to the findings made by the court itself. It is insisted that the evidence, written or oral, shows Ware to have been acting in a fiduciary capacity; that the money was paid to him to induce a violation of a trust; and that even if the $2500 was given to Ware as Spinney's agent to pay the expenses of the consolidation of the fraternal organizations it was still part of a contract wherein $10,000 was agreed to be paid to Ware and his associates on personal account. It is also said that there was an unexpressed purpose that the money should be corruptly used to bring about the consolidation of the companies. On the other hand, counsel for Spinney calls attention to testimony that the $2500 was turned over to Ware to be used, as far as necessary, to pay the expenses of calling and holding a meeting of the directors of the National Aid Association with a view of authorizing the consolidation, and also to the receipt given when the money was paid, in which it was recited that it was to be used to pay the necessary expenses of combining the organizations. He also refers to the formal contract, in which it was expressly stated that the $2500 was placed with Ware to defray the necessary expenses of the consummation of the consolidation, as the same should be needed. There is sufficient testimony to sustain the findings of the court as to the purpose for which the money was paid. It was placed with Ware to be paid to others in the accomplishment of that purpose, and not for his own use or benefit. This provision was independent of the one in which provision was made to turn over to Ware and others $10,000 in notes in payment of their personal claims, which notes were the subject of litigation in *Scott v. Bankers' Union,* 73 Kan. 575, 80 Pac. 604.

It is contended here that the transaction was not contrary to good morals, and attention is called to the fact that *Scott v. Bankers' Union, supra,* proceeded on the theory that it was not illegal. It was there held that while the contract under which the notes were given to Ware and others was not binding on the Bankers' Union, it was enforceable against Spinney, who had individually signed the notes. In speaking of the transfer of the membership of the National Aid Association, which was insolvent, to the Bankers' Union, which was a going concern, Mr. Justice Graves remarked:

"The transaction in which they [the notes] were given was not unlawful, or contrary to public policy. The consolidation of such corporations might be desirable and useful to both associations, and proper and legitimate in every way. The officers of the National Aid Association did not attempt to sell out their company, nor to betray their trust; they only undertook to advise with and urge the subordinate lodges and members to consent to the proposed merger. This was proper. The National Aid Association could not exist alone very long, and any change which promised protection to its certificate holders was desirable. We think this effort on the part of the officers was not vicious, but commendable." (Page 589.)

Assuming, however, that the purpose was unlawful, as some of the testimony tends to show, Spinney was not barred from a recovery of so much of the money as was unexpended. The general rule is that the law will not aid either party to an illegal agreement, but an exception is made where the illegal agreement or purpose has not been carried out. This was not an action to enforce the agreement between Spinney and his agent, Ware, nor is the judgment rendered by the court in any sense an affirmance of the agreement. Granting that the purpose of the parties was unlawful, the action is rather a repudiation of that purpose and a disaffirmance of the agreement.

"The broad rule has been laid down that when

money or property is delivered by a principal to his agent for an illegal purpose or for the purpose of carrying into execution an illegal contract the agent cannot set up such illegal object to prevent a recovery by the principal from the agent of such money or property, so long as it remains in his hands." (15 A. & E. Encycl. of L. 1009.)

In the note accompanying this text may be found a large number of sustaining authorities. The agent cannot retain the money merely because the transaction in contemplation was illegal. The illegality that defeats a recovery of the money is not in the intent alone. It has been well said:

"Persons may not be punished either in civil or criminal courts for unlawful intentions. It is the consummation of these unlawful intentions that places a party without the law. If the unlawful intention or transaction is not carried out, if nothing is done under it, my servant has my property, and I am entitled to its return. As in the present case, he is acting under a special agency which I have a right to revoke at any time before performance, and, when so revoked, I am entitled to my own. It cannot be better public policy to deny me a recovery of the stock than to encourage my agent to commit a criminal offense." (*Wassermann v. Sloss,* 117 Cal. 425, 431, 49 Pac. 566, 38 L. R. A. 176, 59 Am. St. Rep. 209.)

Until the contemplated action is executed—the money converted to the illegal use—the parties are given an opportunity to repent and rescind, and the doctrine of *locus pœnitentiæ,* as it is called, is applied.

"Seeing the error of his ways, the law says a party may withdraw from the transaction; and it extends to him a helping hand by offering the inducement of giving back to him anything of value with which he has parted." (*Wassermann v. Sloss, supra,* p. 428.)

The same view was well expressed by the supreme court of Maine when it said:

"The law encourages a repudiation of the illegal contract, even by a guilty participator, as long as it remains an executory contract or the illegal purpose has

not been put in operation. . . . 'It best comports with public policy to arrest the illegal transaction before it is consummated.'" (*Tyler v. Carlisle*, 79 Me. 210, 212, 213, 9 Atl. 356, 1 Am. St. Rep. 301.)

In *Morgan v. Groff*, 4 Barb. (N. Y.) 524, it was said:

"As long as money deposited with an agent for an illegal purpose remains unemployed, or if the purpose be countermanded by the principal before its application, it is a debt which may be recovered from the agent by the principal, either at law or in equity." (Page 529.)

The principle of these cases has been adopted and applied in this state. In the case of *Hardy v. Jones*, 63 Kan. 8, 64 Pac. 969, 88 Am. St. Rep. 223, an action was brought by a principal to require his agents to account to him for money placed in their hands to purchase property at a judicial sale, under an agreement which had for its purpose the suppression of competition at the sale. After the sale there remained in the hands of the agents a portion of the fund placed in their hands, and they refused to account for this, on the ground that their agreement was void as against public policy. The court refused to listen to this reason or excuse, saying:

"As long as an illegal contract remains unexecuted neither party can be held to its terms. At any time before Hardy and Turbush had acted in behalf of Jones the latter might have revoked their authority, or they upon their part might have refused to execute their agency, but even in such case the agents could have been compelled to account to their principal for his money. So, likewise, will they be compelled to account for any unexpended balance remaining over from the execution of the illegal agreement. The surplus money now held by them is not held in pursuance of an illegal agreement . . . to suppress competition at a judicial sale. The sale has been had, and the unexpended purchase-money is now held by plaintiffs in error the same as they would hold any other money of the defendant in error." (Page 10.)

(See, also, *Pollock v. Agner*, 54 Kan. 618, 38 Pac.

781; *Peters et al. v. Grim,* 149 Pa. St. 164, 24 Atl. 192, 34 Am. St. Rep. 599; *Adams Express Co. v. Reno, Reno, interpleader,* 48 Mo. 264; *Bank v. Wallace,* 61 N. H. 24; *Norton v. Blinn,* 39 Ohio St. 145; *Kiewert v. Rindskopf,* 46 Wis. 481, 1 N. W. 163, 32 Am. Rep. 731; *Clarke, Harris & Company v. Brown,* 77 Ga. 606, 4 Am. St. Rep. 98; *Springs Co. v. Knowlton,* 103 U. S. 49, 26 L. Ed. 347; Wood's L. of Mas. & Ser., 2d ed., § 202; Dunlap's Paley on Agency, *66; 9 Cyc. 554-557.)

The fact that Ware was an officer of, and owed duties to, the National Aid Association does not affect the application of the rule requiring him to account for the money received and not yet disbursed. It is assumed that he was acting unlawfully, but he was acting as the representative of Spinney and held Spinney's money to be used for the purpose stated. Under the rule of the authorities it is his duty to account to Spinney for the unexpended portion of the money, and this duty does not arise out of the illegal agreement and purpose but out of the receipt and retention of the money of another which has not been converted to the proposed illegal use.

There appears to be nothing substantial in the claim that there was a departure from the pleadings, nor do we find any ground for a reversal.

The judgment is therefore affirmed.