C. C. HARRIS *et al.* V. THE INDEPENDENCE GAS COMPANY.

No. 15,008. (92 Pac. 1123.)

SYLLABUS BY THE COURT. ·

1. CORPORATIONS — *Ultra Vires Contracts — Collateral Inquiry.* The question of the character of business a corporation is authorized to engage in is ordinarily a matter between it and the state, not open to collateral inquiry; and one who has entered into a contract with a corporation which is otherwise unobjectionable cannot maintain a suit for its cancelation upon the ground that it relates to a transaction foreign to any purpose mentioned in the company's charter.

2. ——— *Oil-and-gas Lease—Suit to Cancel—Estoppel to Deny Corporate Capacity.* One who has executed to a corporation an oil-and-gas lease—an instrument granting the right to explore a tract of land for oil and gas and to appropriate either if found—cannot maintain a suit to cancel the portion thereof relating to oil on the ground that the only purpose of the company's existence mentioned in its charter is "to dig or mine for natural gas and sell the same for heat and lighting purposes."

Error from Montgomery district court.; THOMAS J. FLANNELLY, judge. Opinion filed December 7, 1907. Affirmed.

*Joseph P. Rossiter,* for plaintiffs in error.

*Stanford & Stanford, F. J. Fritch, John J. Jones,* and *Eugene Mackey,* for defendant in error; *Lee & Mackey,* of counsel.

The opinion of the court was delivered by

MASON, J.: Cornelius Carr and his wife executed to the Independence Gas Company an oil-and-gas lease; that is, an instrument granting the right to explore a tract of land for oil or gas and to appropriate either if found. The company is a Kansas corporation and at the time of the execution of the lease the only purpose mentioned in its charter was "to dig or mine for natural gas and sell the same for heat and lighting purposes." Later an amendment was made adding thereto the mining and selling of oil. What are called the "gas rights" under the lease have been transferred to another gas company and no point is raised with regard to them. The Carrs, claiming that the lease so far as it related to oil was void because at the time it was executed the lessee had no authority to engage in the oil business, undertook to grant the oil privileges anew to C. C. Harris, who upon that ground brought a suit against the Independence company to cancel all of its contract excepting that portion relating to gas, joining his grantors as coplaintiffs. The trial court sustained a demurrer to a petition setting out substantially these facts and this proceeding is brought to review that ruling.

The defendant maintains: (1) That it had the implied power to produce and market oil as an incident to the express power granted to it to produce and market gas; (2) that if it originally lacked such power the defect was supplied by the charter amendment; and (3) that even if it had no authority to enter into the contract the plaintiffs cannot take advantage of the fact. It will only be necessary to consider the questions involved in the third proposition.

Although the decisions relating to the doctrine of *ultra vires* are characterized by some confusion as well as by much conflict, they admit of classification into fairly well-defined groups and exhibit a development in the direction of restricting the scope of its operation. Those courts which accord it the most favorable treatment—allow it the largest field of action—proceed upon the conception that a corporation, being the creature of the state, possesses no power whatever beyond that granted in its charter, and cannot directly or indirectly acquire rights or incur liabilities under any contract not thereby authorized. They refuse under any circumstances to enforce or give effect to an unauthorized contract, as such, but where it has been acted upon will protect the parties against hardship and injustice by allowing whatever relief may be suited to the facts of the case; for instance, by permitting either party to recover money or property which has been parted with in the transaction, or to have compensation therefor. The cases illustrating this treatment of the matter are collected in volume 29 of the American and English Encyclopædia of Law, at page 54, note 2. The theory is consistent and logical, but its practical effect is so to circumscribe the power of the court as to make the relief furnished at times inadequate to the occasion.

In a larger number of jurisdictions, although the same conception of corporate capacity is adopted, its effect is greatly changed by the application of another principle. Here the courts concede that a corporation has no power to make a contract except such as is conferred by its charter, expressly or by necessary implication. But they hold that as it must have some discretion in the manner of carrying out the purposes of its creation—some freedom of action—it is amenable to the same rules of conduct as a natural person, and may estop itself to question the validity of an agreement it has assumed to make, or may acquire the right to invoke a similar estoppel in its own behalf.

Where this theory is accepted recovery may be had upon a contract which is in fact void, simply because its validity cannot be put in issue. The cases in point are gathered in volume 29 of the American and English Encyclopædia of Law, at page 57, note 1.

These cases have been criticised for the use they make of the word "estoppel" as descriptive of the principle upon which they are based. It is argued that as a corporation must know the terms of its own charter, and as one dealing with it is charged with like knowledge, neither party to an *ultra vires* contract can be misled in that respect, and therefore there must always be lacking an essential element of what could with technical accuracy be called estoppel. This, however, is a mere question of terminology. The requirement that one shall be consistent in conduct—shall not occupy contradictory positions—shall not retain the advantages of a transaction and reject its burdens—is often spoken of as a form of estoppel. The term is convenient, and, if inaccurate, is not misleading. This rule of estoppel affords a good working hypothesis to accomplish just results. If it fails to accomplish all that might be desired in a practical way it is because it is not made sufficiently far-reaching. It is generally held to be inapplicable to purely executory contracts, one reason stated being that "where neither party has acted upon the contract, the only injustice caused by a refusal to enforce it is the loss to the parties of prospective profits, and this is too slight a consideration to weigh against the reasons of public policy for declaring it void and not enforceable." (29 A. & E. Encycl. of L. 49.)

It might seem reasonable that a system which attempts not only to protect a party to an *ultra vires* contract from actual loss, but, where equity requires it, to insure to him the actual fruits of his bargain, ought for the sake of completeness and symmetry to enable him to insist upon the performance even of a

48—76 KAN.

purely executory contract. It certainly seems against conscience that one who has entered into a contract in the expectation of deriving a profit from it may upon discovering the probability of a loss repudiate it and escape responsibility by raising the question of want of corporate capacity. Parties to a contract who deal with each other upon the assumption that one of them is a corporation are ordinarily precluded from questioning the validity of its organization.

"Although, as against the state, a corporation cannot be created by the mere agreement, admission, assent, or other act or omission of private persons, yet, as between themselves and for the purposes of their own private litigations and contestations, they may, by their agreements, their admissions, or their conduct, estop themselves from denying the fact of the existence of the corporation; so that for the purpose of such private litigations the body claiming to be a corporation and having a colorable existence as such becomes such to all intents and purposes as much as though it were a corporation *de jure*. . . . A leading branch of the doctrine is that whenever a private person enters into a contract with a body purporting to be a corporation, in which contract the body is described by the corporate name which it has assumed, such private person solemnly admits the existence of the corporation for the purposes of the suit brought to enforce the obligation, and in such an action will not be permitted to plead *nul tiel corporation* or otherwise to deny the corporate existence of plaintiff. . . . One theory of the rule is that by entering into a contract with the assumed corporation as such the contracting party admits its existence and will not thereafter be permitted to change front and deny it. . . . The rule of estoppel works both ways. A body which has held itself out as a corporation and which has incurred obligations in a corporate name and character is, when proceeded against by the obligee, estopped to deny the regularity of its organization or otherwise to deny the validity of its corporate existence." (10 Cyc. 244-246, 249.)

The question whether a corporation has power under its charter to engage in a particular business is so

like the question whether a body has capacity to act as a corporation at all as to afford good ground for arguing that whatever circumstances work an estoppel to raise the one have the same effect with respect to the other. This is recognized in volume 10 of the Cyclopedia of Law and Procedure, at page 248, where it is said:

"A person contracting with an ostensible corporation to do an act which is not prohibited by law becomes estopped, in an action by the corporation to enforce the contract, either to deny the existence of the corporation or its power to enter into such a contract." (¶ *i.*)

The cases cited in support of this text, however, arose upon executed contracts, and we do not discover that the principle has actually been applied in actions upon purely executory agreements, unless where the question sought to be raised was whether a body assuming to act as a corporation had a legal existence as such. Nevertheless, no good ground is apparent for a distinction in this regard.

A large majority of the adjudications on the subject of *ultra vires* fall into one or the other of the two groups already referred to. The conception of corporate power upon which they depend has been styled that of "special capacities," in distinction from that of "general capacities." (See article by George Wharton Pepper on "Exercise of Corporate Power," 9 Harv. L. R. 255.) The conception designated by the latter term is in brief that while a corporation has no right to exceed the limits of its charter it has the power to do so. The theory was elaborated in the opinion of Mr. Chief Justice Comstock in the celebrated case of *Bissell v. The Michigan Southern and Northern Indiana Railroad Companies*, 22 N. Y. 258, where it was said:

"Like natural persons, they [corporations] can overleap the legal and moral restraints imposed upon them; in other words, they are capable of doing wrong. . . . The distinction between power and right is

no more to be lost sight of in respect to artificial than in respect to natural persons. . . . Why, it may be asked, does the law provide the remedy by *quo warranto* against corporations for usurpation and abuse of power? Is it not the very foundation of that proceeding that corporations can and do perform acts and usurp franchises beyond the rightful authority conferred by their charters? Most assuredly this is so. The sovereign power of the state interposes, alleges the excess or abuse, and on that ground demands from the courts a sentence of forfeiture." (Pages 264, 265.)

These expressions were merely those of the chief justice, for the case was decided upon other considerations, but the theory presented has since been adopted by the New York courts. (See *Vought v. Eastern Bldg. & Loan Assn.*, 172 N. Y. 508, 65 N. E. 496, 92 Am. St. Rep. 761.) This theory, logically followed out, would obviously make all corporate contracts, executory as well as executed, enforceable between the parties. It has not, however, met with any large acceptance, at least in the form stated. (See, however, 29 A. & E. Encycl. of L. 45, note 2.) But a recent tendency has been developed to reach substantially the same result by a somewhat different course of reasoning, resulting in a doctrine which is thus stated in volume 10 of the Cyclopedia of Law and Procedure, at page 1164:

"A most important doctrine connected with this subject, and one which rises above the mere principle of estoppel, is that whether a corporation has acted without authority conferred on it by the legislature or has acted in contravention to an act of the legislature cannot be set up collaterally by individuals who deal with it, or by third persons, but can be set up only by the state in a direct proceeding to forfeit its charter, to oust it of some particular franchise, or to subject it to punishment; or where the question is otherwise litigated between the state and the corporation."

The cases applying or discussing the doctrine are collected in notes to this text and to succeeding para-

graphs in the same work. The principle referred to, if sound, is manifestly sufficient in itself to defeat the defense of *ultra vires* even when interposed against the enforcement of an executory contract; but it must be admitted that in practice it seems to have been applied only where the agreements had been at least partially performed. It seems often to have been invoked, however, in aid of the ordinary doctrine of estoppel, in cases where the contract upon one side or the other had already been performed. The best and most complete expression of it is found in the decisions of the Wisconsin court. In *John V. Farwell Co. v. Wolf and others*, 96 Wis. 10, 70 N. W. 289, 71 N. W. 109, 37 L. R. A. 138, 65 Am. St. Rep. 22, it was said:

"Judge Thompson, in his valuable treatise on the Law of Corporations (volume 5), commenting on the subject (secs. 6033-6038), appears to deprecate the prevalence of the 'new doctrine,' and to argue against its further extension, upon the ground that it practically destroys the effect of the doctrine of *ultra vires,* as applied to the unauthorized exercise of corporate power; but the learned author is manifestly in error in that respect. Such doctrine, notwithstanding the limitation which modern development has placed on the means by which it may be called into use, still exists, and may and will continue to exist, adapted as fully as ever to restrain the abuse of corporate franchises and authority, and to punish such abuse whenever the state, in its sovereign capacity, sees fit to exercise it: That such doctrine cannot be resorted to as a weapon for attack and defense in the hands of mere private persons, and used as a ready means of embarrassing business operations by and with corporate bodies, which directly or indirectly touch and administer to human desires at every turn of the individual in modern life, while its effectiveness for all essential purposes of restraint and punishment is fully preserved, furnishes no cause for regret, but rather cause for gratification at the evidence of how certainly principles, by natural growth and development, adapt the law and its administration to the ever-changing needs of advancing civilization, so as best to promote justice and the common welfare. When a corporation

offends against the law of its creation, such offense is against the sovereignty of the state; hence it is most proper that the state should apply the remedy and be charged with the sole responsibility in that regard, and such is the law by the trend of modern authorities, which we approve." (Page 16.)

And in *The Zinc Carbonate Co. v. The First National Bank of Shullsburg*, 103 Wis. 125, 79 N. W. 229, 74 Am. St. Rep. 845:

"This and other courts have so often held that a corporation cannot violate its charter for pecuniary gain and retain the benefits of its illegal conduct by putting up the shield of *ultra vires*, or a person set himself up as the champion of the state in a court of justice to either punish or defend a corporation by an appeal to such doctrine in order to enable him or it to obtain or retain an unconscionable advantage, that we may safely reject the idea that it was thought a contrary view ruled the issue of law in the case adversely to appellant. The doctrine of *ultra vires* is a most powerful weapon to keep private corporations within their legitimate spheres and to punish them for violations of their corporate charters, and it probably is not invoked too often; but to place that power in the hands of the corporation itself, or a private individual, to be used by it or him as a means of obtaining or retaining something of value which belongs to another, would turn an instrument intended to effect justice between the state and corporations into one of fraud as between the latter and innocent parties. Such is the modern doctrine, evolved and settled in the progress of events, reaching from the time when private corporations were few and the doctrine of *ultra vires* invoked quite as freely as to them as to public corporations, to a time when substantially all restrictions to the formation of such private bodies were removed, and they were authorized and commenced to exist, great and small, everywhere, for the purpose of conducting almost every kind of legitimate business. If such a body transcend its powers it commits a wrong against the state, and ordinarily it is for the state only to call it to account for such violation." (Page 131.)

· And in *Security Nat. Bank v. St. Croix Power Co.*, 117 Wis. 211, 94 N. W. 74:

"This court, by a series of decisions, has held that, when a corporation enters into business relations not authorized; by its corporate grant of power, the doctrine of *ultra vires* cannot be used by it or by the person with whom it assumes to deal as a means of defeating the obligations assumed. The state alone can take advantage of the abuse. . . . The fact that · this court has adopted the principle that the question cannot be litigated by private parties, a principle with which we are entirely satisfied, relieves us from further consideration of the question." (Pagés 217, 218.)

None of these cases arose upon an executory contract, and in *John V. Farwell Co. v. Wolf and others,* *supra,* that consideration was referred to, the decision being expressly limited to the question before the court. But in *Security Nat. Bank v. St. Croix Power Co.,* *supra,* although the contract involved was in fact executed, the principle was broadly stated without reference to that matter, as shown by the quotation made from the opinion.

The principle referred to is closely allied to, if indeed it is not substantially identical with, that which forbids the regularity or validity of the organization of a corporation to be inquired into except at the instance of the state. (10 Cyc. 256.) The reason for such rule is thus stated in *Pape v. Capitol Bank,* 20 Kan. 440, 27 Am. Rep. 183:

"This is not upon the ground of equitable estoppel, but upon grounds of public policy. If the state, which alone can· grant the authority to incorporate, remains silent during an open and notorious assertion and exercise of corporate powers, an individual will not, unless there be some powerful equity on his side, be permitted to raise the inquiry. The law holds out no such encouragement to attempt to avoid the payment of contract debts." (Page 445.)

The question whether a corporation has a legal

existence is a question whether it has capacity to act at all. This is essentially of the same character as the question whether it has capacity to enter into a particular contract—in other words, whether it has a legal existence for that purpose. The state grants the corporation the right to do business under limitations expressed in language to which both agree. Whether the language of the charter shall be interpreted to authorize a given act is a matter between the parties to it. If the state is satisfied with the construction upon which the corporation acts no reason is apparent why it should be open to question by a stranger, much less by one who has recognized it as valid by contracting with the corporation upon that basis.

This court has already held that a contract made by a corporation without authority may be rendered enforceable by estoppel. (*Town Co. v. Morris,* 43 Kan. 282, 23 Pac. 569.) It was there said that the rule did not apply to executory contracts, but that question was not involved. In *Morisette v. Howard,* 62 Kan. 463, 63 Pac. 756, other Kansas cases to the same effect are collected. The court there refers to the matter of collateral attack, saying:

"Aside from these considerations, the transaction had been completed, the money had been paid, the property had changed hands; all having been done with the knowledge and consent of those in whom the ultimate authority rested, and from whom the board of directors derived its power, the transaction, however irregular, is not open to attack by any one other than the state." (Page 467.)

The case of *Scott v. Bankers' Union,* 73 Kan. 575, 85 Pac. 604, turned merely upon a matter of constructive notice. The notes sued upon were not enforceable unless they were held by an innocent holder. As was said in the opinion: "The scheme of consolidation failed. These notes were not to be paid unless it succeeded." (Page 588.) The question was not whether a corporation could be held to the terms of a contract

to which it had agreed, but whether the law would attach to its promise to pay money the peculiar qualities of commercial paper. What was decided was that the corporation had no power to issue negotiable notes; that the purchaser was charged with notice of that fact, and therefore took them subject to any defenses that could have been made against the original holder.

The case of *Bankers' Union v. Crawford*, 67 Kan. 449, 73 Pac. 79, 100 Am. St. Rep. 465, growing out of the same transaction, can be distinguished from the one at bar on several grounds. The attempt there was to hold one assessment-insurance company for the payment of a beneficiary certificate issued by another on the theory that there had been a consolidation of the two. The contract of consolidation was held to be void as beyond the powers of either company. The corporations there involved were not ordinary business concerns. They possessed no corporate stock. The contract relied upon, to which the plaintiff was not a party, was one incapable of performance, and against good morals as involving a diversion of trust funds.

Very much the same principle as that already discussed was applied in *The State v. Book Co.*, 69 Kan. 1, 76 Pac. 411, 1 L. R. A., n. s., 1041, in denying the right of a party to a contract to demand its cancelation because of the failure of the other party—a foreign corporation—to comply with the statute relating to such organizations. In the opinion it was said:

"From this survey of the statute it appears that the legislature intended it to be complete; that the regulation of foreign corporations, and not the penalizing of business transactions, is its purpose; that such regulation is made the concern of the state in its special capacity as visitor, and not of any individual as a mere party to a contract; that a party to a contract is allowed to interfere in but a single instance, and then only to the exent of abating a suit against him; and that specific penalties are chosen to meet certain contingencies. The conclusion obviously and naturally follows that the legislature intended the state to rely

upon the common-law remedies for the enforcement of the statute where none other was expressed; that the courts have no authority to interpolate in the law provisions concerning which the legislature, with all the resources of the English language at its command, remained silent, or to annex penalties for a violation of the law which the legislature, with a great arsenal to choose from, failed to mention. Hence contracts made with a foreign corporation before it has obtained permission to do business in the state are not, for that reason, invalid or subject to cancelation. . . . It is utterly illogical to compromise in a matter of interpretation, to palter with the status of such contracts and attempt to distinguish between those which are executed and those which are unexecuted, or to say they may be voidable if they are not void, or withhold remedies for a time. Such contracts are valid or invalid, and if valid are not subject to cancelation, and are enforceable as other contracts are enforceable, except as the law has restricted the corporation in its right to maintain an action or recover a judgment." (Pages 7, 18.)

As in that case, the whole question here presented is as to the real intention of the legislature. A section of the corporation act reads:

"No corporation created under the provisions of this act shall employ its stock, means, assets, or other property, directly or indirectly, for any other purpose whatever than to accomplish the legitimate objects of its creation." (Gen. Stat. 1901, § 1285.)

Such provisions are regarded, however, as merely declaratory and do not affect the ordinary rule as to the enforceability of contracts.

"A provision in a general corporation law that no corporation created thereunder shall employ its assets for any other purpose than to accomplish the legitimate objects of its creation is merely declaratory of the common-law rule by which corporations are confined in their powers to the purposes for which they are created, and does not amount to such an express statutory prohibition of *ultra vires* loans and other transactions as to render them illegal instead of *ultra vires* merely." (1 Clark & Marshall, Priv. Corp. § 225*b*.)

Harris v. Gas Co.

No Kansas statute declares that a contract made by a corporation in excess of its legitimate powers shall be void, or in terms permits the question of corporate capacity to be raised by one of the parties. Where it is held that no recovery can ever be had upon an *ultra vires* contract, as such, whatever relief is afforded is logically made to turn upon whether and how far the agreement has been acted upon. Where a recovery is sometimes permitted under the contract itself, upon the principle of estoppel, the question whether it has been carried out is likewise of manifest importance, there being a difference in degree at least between the attitude of one who has merely entered into an engagement in expectation of obtaining an advantage from it and that of one who has actually reaped its benefits in whole or in part. But the doctrine that only the state can challenge the validity of acts done under color of a corporate charter, if accepted, must necessarily protect an executory contract from collateral attack equally with one that has been executed. The court is convinced of the soundness of the view that in the absence of special circumstances affecting the matter neither party to even an executory contract should be allowed to defeat its enforcement by the plea of *ultra vires*. The doctrine is logical in theory, simple in application, and just in result. It of course does not apply to contracts which are immoral or which are illegal, as distinguished from merely unauthorized, or to those made by public corporations. Nor does it forbid interference by a stockholder to protect his rights as such.

Upon these considerations the judgment is affirmed.