No. 30,954.

Ruth Funk Brollier, *Appellant*, v. The Bankers Mortgage Company, of Topeka, *Appellee.*

(20 P. 2d 817.)

Opinion filed April 8, 1933.

*Clinton J. Evans,* of Topeka, for the appellant.

*E. H. Hatcher, Clayton E. Kline, N. J. Ward* and *F. A. Holder,* all of Topeka, for the appellee.

*Roland Boynton,* attorney-general, *John G. Egan,* assistant attorney-general, *Robert Stone, J. A. McClure, John L. Hunt,* all of Topeka, and *Henry M. Isaacs,* of Minneapolis, Minn., *amici curiæ.*

The opinion of the court was delivered by

Burch, J.: Plaintiff purchased of defendant a bond for $1,000 of a type which defendant issued. The price was payable in installments. In May, 1929, she surrendered the bond and took two others for $1,000 each. On May 2, 1930, she brought an action for a declaratory judgment, first, that the bonds are void; or, second, if the bonds are not void, that she is entitled to surrender them on terms provided in the building and loan association statute. In either event, she would get back all her money with interest, some-

thing which is utterly incompatible with the contracts. The district court found for defendant and rendered judgment accordingly. Plaintiff appeals.

Defendant is a private corporation, organized in 1919, pursuant to subdivision 53 of chapter 125 of the Laws of 1911, authorizing organization of investment and loan companies with power to lend money on real estate, chattel or personal security. (R. S. 17-202, subdiv. 53.) In 1919 and previously, charters were procured on application to the charter board. If after investigation the board determined the undertaking was one for which a corporation could be formed, the application was granted. (R. S. 17-401 to 17-403.) Defendant's charter stated the purpose for which the corporation was formed as follows:

"To loan money on real estate, personal and chattel security."

In 1925 defendant amended its charter to read:

"This corporation is organized for profit, and the purposes for which it is formed are to loan money on real estate, chattels, or personal securities; to sell its bonds, secured by first mortgages on real estate."

In 1925 and previously the law required charter amendments to be approved by the charter board. (R. S. 17-216.)

The original bond issued to plaintiff was dated March 11, 1925. The two bonds issued on surrender of the original bond were issued on May 7, 1929. One bore that date, and the other bore the original date March 11, 1925. A copy of the face of the latter and a copy of the security provision of the privileges and conditions forming part of the instrument are appended to this opinion.

Before amendment of its charter defendant had engaged in the business of selling bonds of the general character of those issued to plaintiff. Since amendment of its charter defendant has continued to issue such bonds. Defendant's interpretation of the law and of its charter has been acquiesced in by the state of Kansas. As will appear later, defendant's business has been conducted under strict and constant state supervision and the state does not now question authority of defendant to issue and sell its bonds. Plaintiff dealt with defendant as having lawful authority to make the contracts in controversy, and plaintiff is forbidden to assert in this action, for any purpose, that the bonds are void for lack of a statute or for lack of a charter under which defendant could conduct its business

of issuing such bonds. (*Harris v. Gas Co.*, 76 Kan. 750, 92 Pac. 1123.)

The original bond had express provisions relating to surrender of the bond for stated cash surrender values at the end of each year beginning with the second year. While the bonds in controversy contain provisions for loan values and for surrender for paid-up bonds, contain nonforfeiture clauses applicable in case of default, and contain provisions for optional settlement at maturity, they do not provide for surrender for cash before maturity except in case of death or disability of the holder.

Arguments that plaintiff has privilege to surrender the bonds and that surrender and surrender value are governed by the building and loan association statute proceed from two premises—first, that the bond transactions are essentially building and loan transactions; and second, that the building and loan statute was amended to classify financial agencies, operating as defendant operates, with building and loan associations for purpose of regulation, including withdrawal of funds.

It so happens there are nine other domestic corporations and nine foreign corporations doing the same kind of business in Kansas that defendant does. One of the foreign corporations, the Investors Syndicate, of Minneapolis, Minn., has been doing business in the state since 1914. Plaintiff's action having been brought to the attention of some of these companies, their attorneys asked and were given permission to file briefs *amici curiæ*. The attorney-general was given leave to file a brief on plaintiff's side. In a subdivision of a reply brief, headed "The Legal Status of the Bankers Mortgage Company," plaintiff undertakes to make her position so clear it may not be misunderstood concerning the proposition that the bond transactions between plaintiff and defendant were essentially building and loan association transactions. The reply brief says:

"The business of this concern is that of a savings institution . . . He [a bondholder] is not an ordinary creditor of the concern at all. That is a mere technicality; he is directly interested in the mortgages in which his funds are invested. . . . These bonds are receipts of an investment agency for the funds which it expects to invest for the benefit of these small investors."

Defendant is a private corporation having a capital stock owned by stockholders. The certificates of stock issued to stockholders are in the usual form of such instruments. Plaintiff is not a holder actually or beneficially of any share of the capital stock of the corporation.

In the conduct of its business the company issues and sells what it calls guaranteed first-mortgage savings bonds. The name given the instruments is fairly descriptive. The instruments are properly called bonds because they are undertakings of the company to pay money. Payment of the money to the bondholder is secured—"guaranteed"—by deposit with and assignment to the bank commissioner of the state of Kansas of first mortgages on real estate. The bonds are called savings bonds because an investor of moderate means may pay for a bond out of savings, in periodical installments.

Some of the bonds are or were called guaranteed first-mortgage, six per cent savings bonds. The reason for the interest characterization will appear from an illustration. An investor buys a bond for $1,000, payable ten years from date. During that period he pays only $720. His payments, with interest at six per cent compounded annually, amount to $1,000, the sum he receives at maturity of the bond. The eleven-year bonds in question are similar in character.

To conduct its business the company must have a central office and certain fixed assets. The company must have in some form what corresponds to departments for discharge of its two chief functions, a selling department to sell bonds and a loan department to make loans on real estate. Conduct of the business embraces innumerable details. The company must pay salaries to officers and employees, commissions to agents, and expenses of various kinds. In case of foreclosure of mortgages, it may acquire certificates of sale and deeds of land, which become part of the assets of the company.

What are the directors of this corporation doing in conducting the business described? The answer is simple and obvious. They are trying to make money to pay operating expenses, to accumulate a surplus for safety, and to accumulate funds for distribution as dividends to stockholders. If the corporation accumulates a surplus from profits, the bondholder has no interest in the surplus. Whether the corporation makes or loses money, the bondholder's rights are not affected. His interest is purely a fixed pecuniary demand. In case of default by the company, the bondholder recovers what is nominated in the bond, no more and no less, and he gets that in any event, if the company is solvent or the security is intact. No bond is a receipt for anything but the initial payment. The money which a bondholder pays to the company becomes the company's money. The company invests its own money in real-estate mortgages for

its own benefit, and then, as owner, places the mortgages with a depositary to secure bondholders. The result is, the statements quoted from the reply brief of plaintiff concerning the relation of plaintiff to defendant force the facts and misapply the law, and the relation between the company and the bondholder is that of debtor and secured creditor.

The foregoing is sufficient to dispose of the contention that the transactions between plaintiff and defendant were essentially transactions between a shareholder of a building and loan association and the association. The fallacy of the contention will further appear in the discussion of the subject of statutory classification of defendant's business with building and loan association business for the purpose of regulating withdrawal.

In determining the question of classification, the first building and loan association statute which needs to be considered is chapter 78 of the Laws of 1899. That statute provided for the incorporation of building and loan associations, for the adoption of by-laws by shareholders, and for election and qualification of officers and directors. Section 6 related to powers of the corporation and read as follows:

"The object of such corporations shall be the accumulation of a capital in money, to be derived from the payments by its members in periodical installments or otherwise, at such time and in such manner as shall be provided in the by-laws, and from the profits and accumulations arising from the investment of such payments. The capital so accumulated by any corporation created by virtue thereof shall not exceed in the aggregate and full ultimate value the sum of ten million dollars, and shall be divided into shares of equal value; the ultimate value of such shares shall not exceed one thousand dollars. Said capital may be issued in full-paid, prepaid, deposit or installment shares, in such amounts and at such times and in such manner as may be provided in the by-laws. Any such corporation may issue permanent or guarantee stock, for which the full par value shall be paid at the time of issue or in installments of five dollars per share, at the option of the purchaser, and upon which permanent stock a full dividend or a definite dividend may be paid, which dividend shall in no case exceed the per cent of profit acquired by all other classes or series of stock at the time such dividend is declared. The balance of profits (if any) and the principal paid on said stock shall not be paid to the holders of the same until all lawful claims of every other class of stock in its series, as expressed in the certificates of such other classes, and all other liabilities of such corporation, shall have been fully liquidated and paid. Payments of dues or installments on shares shall commence and date from the time provided in the by-laws. There shall be issued to every shareholder a certificate signed by the president and secretary of the corporation,

and evidenced by its corporate seal, setting forth distinctly and clearly the class of stock for which he has subscribed, and the provisions in the by-laws relating to stock of the class, the interest which it may draw, and the withdrawal value which it may have at any time, and also the time when the said stock shall be withdrawable, and shall provide that a nonborrowing stockholder, on withdrawing after the end of the first year after becoming a stockholder, shall receive not less than ninety per cent of the amount of the money he has paid to the association, less his proportionate share of the net losses of the association during the time he was stockholder. . . ."

The statute provided for loans or advances to shareholders from accumulated capital; for forced retirement of shares; for voluntary withdrawal of shareholders; for payment of dividends from earnings of the association only; for payment of matured shares; and, in general, provided for organization and conduct of a type of building and loan association. Building and loan associations were placed under supervision of the bank commissioner.

The statute of 1899 was amended in 1911. The phraseology of section six was changed in some particulars. In the portion providing for issuance of "permanent or guarantee" stock, the words "or guarantee" were omitted. In the portion relating to payment for permanent stock, the word "monthly" was inserted before the word "installments." In the portion relating to dividends on permanent stock, the words "per annum" were omitted, and the expression "all other classes or series of stock" was changed to "any other class or series of stock." In the portion relating to what the shareholders' certificates shall recite, the words "the interest which it may draw" were changed to "the dividend which it may draw." The provision relating to what a withdrawing nonborrowing shareholder shall receive was changed to "and shall provide that a nonborrowing stockholder on withdrawing shall receive not less than the full amount of the dues he has paid to the association." The provision for deducting losses was omitted.

In 1919 the section under consideration was amended by omitting the limitation of amount of capital stock. Amended as indicated, the section became R. S. 17-1006, which is still the law.

While the type of building and loan association indicated differs in many particulars from other private corporations and business associations, building and loan associations are corporations for profit accruing to shareholders from conduct of the business, and this is true whatever the method of issuing stock. As between share-

holders, the basic features of the original neighborhood building and loan club—membership and mutuality—still exist.

In 1911 a new section was added to the building and loan association law, which reads:

"The name 'building and loan association' as used in this act shall include: First, corporations formed for the purpose of receiving money from and loaning money to their members only. Second, corporations, associations, companies, copartnerships and individuals transacting the business of issuing or selling bonds, debentures, certificates, shares of stock or other papers by whatever names said instruments may be designated, whether said instruments are issued for money paid in advance or for money to be paid in installments, but with an intent, either implied or expressed, that the proceeds or accumulated installments thereof and thereon or any part thereof are to be withdrawable or repayable with accumulated profits at some future fixed or indefinite date of maturity: *Provided,* That all payments made in advance or in installments, or otherwise, on any of the foregoing instruments shall be subject to the same provisions for withdrawal or repayment as payments on building and loan association stock. . . ." (Laws 1911, ch. 131, § 12.)

The section closed with a proviso that it should not apply to companies engaged in banking or insurance. The first part of the section was modified in 1925 to read:

"That the term building and loan association, as used in the statutes of Kansas, shall be construed to include: First, corporations formed for the purpose of receiving money from and loaning money to their members . . ." (Laws 1925, ch. 127, § 6.)

It will be observed form of expression only was changed. Substance was not affected, and as thus modified the quoted portion of the section is still the law.

The amendment of 1925 made the building and loan association law apply generally to the corporations and other business associations named in the quoted portion of the original section, placed them under jurisdiction of the building and loan supervisor, and required submission of by-laws and plans of business to the bank commissioner for approval; but no kind of business agency other than those specified in the original section was affected by the amendment.

Because the quoted portion of the section was enacted in 1911, received careful legislative revision in 1925, and has not since been changed, the legislature must have expressed itself precisely as it desired. The section applies first to building and loan associations proper. Then, the section applies (1) to corporations, etc.; (2) which issue bonds, etc.; (3) with a specified intention. The specified intention is that whether payments for bonds, etc., be made in ad-

vance or in installments, the proceeds or accumulated installments are repayable or withdrawable with accumulated profits.

The statute is a building and loan association statute, not an investment and loan company statute, and there is no indication that business not reasonably classifiable with building and loan association business was arbitrarily forced into the same category with building and loan association business.

According to the usual and ordinary significance of the words, "accumulated profits" mean accumulations by the corporation of excess of value of returns over value of advancements in the conduct of the corporate enterprise. The bondholder contemplated by the statute does not accumulate anything. The company does the accumulating. It accumulates funds from bondholders and it accumulates earnings. When the bondholder gets back money paid in advance or in installments, he also gets a share of what the corporation has earned, distributable as profits. He thus occupies a relation to the corporation similar to the relation between a building and loan association member and the association.

Section 6 of the law of 1899, and various other sections of the building and loan association law forming context of the section under consideration, make the meaning of accumulated profits perfectly clear, and there is no warrant for believing the legislature used the same words in distinctly different senses.

On the same day the 1911 building and loan association statute took effect, another statute took effect defining investment companies and regulating sale of the stocks, bonds, or other securities of such a company. (Laws 1911, ch. 133.) The act required the plan of business and the proposed contract of the company to be submitted to and approved by the bank commissioner before securities were offered for sale. Building and loan associations and some other business associations were excepted from operation of the statute.

Some light is thrown on the occasion for the building and loan association statute of 1911, including the expanded definition of building and loan associations, in the Kansas chapter of the book "History of Building and Loan in the United States":

"The defective character of the law of 1899, resulting from its preparation by persons unfamiliar with Kansas conditions who tried to foist upon the state regulations developed elsewhere, naturally aroused opposition throughout the state. As Kansas had been overrun with 'national' associations, both

within and outside its borders, romping over the state and issuing cutthroat contracts, the law, as a result of the pressure from associations within the state, was amended in many particulars. This, together with the desire of the legislature to make a good law, resulted in one that was not homogeneous." (p. 397.)

The chapter from which the quotation was taken was written by Charles S. Elliott of the Capitol Building and Loan Association of Topeka.

The words "with accumulated profits" may not be excised from the definition section of the building and loan statute, and their force and effect may not be minimized. They characterize the class of corporations and other business associations brought within the terms of the building and loan association law. In what has been said all the accepted canons of statutory interpretation have been applied. They all lead to the same conclusion, and the result is, the legislature did not include corporations doing business according to the plan adopted by the Bankers Mortgage Company within the regulatory provisions of the building and loan association law.

The foregoing disposes of the merits of this controversy. However, plaintiff makes the contention that sale of bonds issued by the Bankers Mortgage Company and by the eighteen other companies doing business in the state on the same plan, is a bad thing for the people. Because of poor judgment respecting what they are able to buy, and because of the vicissitudes of this harsh world, many persons cannot mature their bonds or take advantage of even liberal nonforfeiture privileges in case of default. Even when bonds provide for cash surrender values, the bondholder does not get enough, or get what he ought to have soon enough, and the company is unjustly enriched. It would seem that notwithstanding the fact the company's funds must be invested in long-time mortgages, the company should nevertheless make oil and water mix by keeping its assets so liquid anybody can get all his money back with interest any time he wants it. In any event, plaintiff contends her bonds are void as against public policy.

In 1913 the investment company law was amended, and in 1915 it was repealed by the speculative securities act, or blue-sky law, the purpose of which was stated to be to prevent unfairness, imposition and fraud in the sale of securities. This law has been amended from time to time and, as amended, is still in force. The blue-sky law distinctly applied to the securities issued by the

Bankers Mortgage Company. Since 1922 the Bankers Mortgage Company has conducted its business under supervision of the blue-sky department, and the record shows the department has not hesitated to exercise its authority to supervise.

As indicated, since 1914 The Investors Syndicate has been selling its securities in this state. In March, 1922, on request made by the bank commissioner for instruction, the attorney-general wrote the following letter:

"In the matter of the rights and authority of the Investors Syndicate to transact business in the state of Kansas and sell its certificates as heretofore permitted by the charter board, have to advise you that I have given same extensive consideration, and am of the opinion that such permit to sell securities is not beyond the power of the charter board. That the granting of such permit did not contravene or violate the building and loan association laws of this state.

"Therefore, if the Investors Syndicate, and other similar corporations, can otherwise qualify, there is no inherent reason in the law why the charter board, on recommendation of your department, could not grant them permits to sell their securities in this state."

The state, through its legal department, has not challenged, and does not now challenge, legality of the business of the Bankers Mortgage Company.

Plaintiff purchased her first bond in 1925, three days before the 1925 amendment of the building and loan association law took effect. The testimony of a witness for plaintiff is abstracted as follows:

"In the years 1924 and 1925 he was the secretary of the Kansas State League of Building and Loan Associations, and the duties of his office required him to meet and discuss with many people the condition of the investment business throughout the state of Kansas, and that he did travel over the state and did discuss financial and investment conditions with many people, and that there were many complaints in respect to the bonds of the Bankers Mortgage Company and other similar concerns. That he heard no complaints about any other kind of investment companies . . . That the affiant was a member of the legislative committee appointed by the Kansas State League of Building and Loan Associations, and that the state legislative committee, during the legislative session of 1925, employed . . . [a] well-known attorney to prepare a bill to amend the building and loan statutes, and in pursuance of such employment said [attorney] did prepare a bill, which was afterwards introduced into the legislature and passed by the legislature, the same now being found as chapter 127 of the Laws of 1925."

The necessary conclusion is that in 1925 the legislature must have carefully scrutinized the building and loan association law with

special attention to bonds and other securities issued by corporations and other business associations, and when the legislature maintained the distinction between bondholders who share profits and those who do not and left the regulation of companies issuing nonprofit-sharing securities to the blue-sky department, the legislature knew exactly what it was doing.

In 1929 the blue-sky law was revised by an act which took effect on July 1, 1929, a few months after plaintiff increased her investment from one bond to two. Provision was made for registration of certain classes of securities by making a certain showing. (R. S. 1931 Supp. 17-1227.) Subdivision 8 of the section related to bonds of the kind plaintiff then held. Having complied with the law, on September 16, 1929, The Bankers Mortgage Company was authorized and empowered by the bank commissioner to proceed with sale of its single-payment bonds, coupon bonds, and guaranteed first-mortgage savings bonds.

The legislature fixes the public policy of this state, and the foregoing demonstrates its policy with respect to the investment business carried on in the state. This court does not sit as a superlegislature, and, without debating the subject, the court declines to proscribe the business of the Bankers Mortgage Company and of the companies doing similar business, on the ground such business is inimical to public policy.

The judgment of the district court is affirmed.

---

## APPENDIX.

$1,000.             No. K-2949.

### THE BANKERS MORTGAGE COMPANY,
#### TOPEKA, KANSAS.

##### GUARANTEED FIRST-MORTGAGE SAVINGS BOND.

Know all men by these presents, That the Bankers Mortgage Company, a corporation, duly organized and existing under and by virtue of the laws of the state of Kansas, certifies that in consideration of the payment of sixty dollars, and five dollars monthly in advance during the period of eleven years from date hereof, hereby guarantees to pay to Ruth Funk, of Moscow, Kan., or the recorded owner hereof, at the expiration of said period, upon presentation and surrender of this bond to the company at its office in Topeka, Kan., the sum of one thousand dollars, ($1,000).

This bond is subject to the privileges, terms and conditions as on the second, third, and fourth pages hereof, which are hereby referred to and made a part hereof, as fully as if set forth in the face of this bond.

In witness whereof, the Bankers Mortgage Company has caused this bond to be executed in its corporate name and its corporate seal to be affixed at Topeka, Kan., this 11th day of March, 1925.

THE BANKERS MORTGAGE COMPANY,

Attest: J. A. FLEMING, *Secretary*.     By M. W. CAVE, *President*.

PRIVILEGES AND CONDITIONS.

1. *Security.* This bond is the direct obligation of The Bankers Mortgage Company of Topeka, Kan., and is registered with the bank commissioner of the state of Kansas. Said company is required by the charter board of the state of Kansas, consisting of the attorney-general, the secretary of state and the bank commissioner, to keep at all times on deposit as collateral security, first mortgages on improved real estate in an amount at least 10 per cent in excess of its liabilities on this and all other like and outstanding bonds issued by it, less the amount of any loan made thereon.

Funds derived from this and like bonds are invested in first mortgages on improved real estate, and said mortgages are inspected and approved by a representative of the charter board and are assigned to and deposited with the bank commissioner and his successors in office, in an amount at least $110 for each $100 of the company's liability on this and like bonds until said bonds are paid by the Bankers Mortgage Company.