No. 33,367

THE SECURITY NATIONAL BANK, *Appellant*, v. THE CRYSTAL ICE AND FUEL COMPANY, and O. L. O'BRIEN, Trustee, Intervenor, *Appellees.*

(67 P. 2d 527)

Opinion filed May 8, 1937.

*Chester Stevens* and *W. D. Kimble,* both of Independence, for the appellant.

*C. J. Bryant,* of Independence, for appellee, Crystal Ice and Fuel Company.

*W. N. Banks, O. L. O'Brien* and *Walter L. McVey,* all of Independence, for the intervenor.

The opinion of the court was delivered by

THIELE, J.: The principal question in this appeal is whether the trial court ruled correctly in sustaining demurrers to plaintiff's evidence.

Plaintiff's petition alleged it was a corporation under the banking law of the United States of America, that the Crystal Ice and Fuel Company was a corporation under the laws of Kansas, that on October 10, 1932, the company delivered to the bank its promissory note for $14,000; that payments were made thereon and that there was due $9,930 and interest, for which it prayed judgment. The company's answer, in substance, alleged the bank had acquired 248 shares of its stock, that the bank sold the company the shares at $90 per share, in consideration for which the company paid the bank $2,320 in cash and delivered its note for $20,000; that payments had been made on the note and renewal notes had been given; that the purchase of said stock by it was not within its corporate power and was *ultra vires* and the notes and renewals thereof were null and void; that the company had paid the bank on the note sums amounting to $13,457, on which dividends of $992 on the 248 shares should be credited, and that the company owned shares in the bank on which dividends amounting to $80 were due it. It was then alleged the company elected to rescind its contract to purchase the stock and tendered the shares into court. It prayed judgment annulling the stock-purchase agreement and for a money judgment for the amounts specified.

O. L. O'Brien was given permission to interplead and filed an answer alleging that he was owner of stock in the defendant company as trustee for certain creditors of Geo. T. Guernsey, and that prior to the execution of the company's note to the bank he had received notice from the company that the bank had acquired the stock and had offered to sell it and that some of the stockholders of the company believed it advisable to reduce the capital stock of the company and acquire the stock; that the proposed price was in excess of the value of the stock; that the company was not in sound financial condition; that it did not have sufficient surplus funds to pay for the stock; that to give its note damaged its credit, etc., all

of which was known to the officers of both the bank and the company; that he attended the stockholders' meeting and voted against the proposition to purchase, and before the vote was taken filed a written objection. It will be referred to later. That at this meeting he verbally stated the company was without authority to enter into an agreement to purchase its own shares, and to purchase the stock was an *ultra vires* act; that notwithstanding, the company purchased said stock, paying cash and giving its note therefor; that the transaction was *ultra vires*, invalid and in contravention of the rights of the stockholders, etc.; that the officers of the company were not acting in good faith, etc., and that he, the trustee, had not in any way approved or ratified the transaction or accepted or received any benefit therefrom, and that there were no intervening rights of innocent parties affected. His prayer was similar to that of the company.

It is not necessary to detail the replies of plaintiff to these answers.

Although at the trial there was controversy about the extent of the issues, whether the bank was the owner of the shares or merely held them as collateral, etc., in our statement of the evidence and discussion thereon we shall assume the bank had acquired and owned 248 shares of stock of the defendant company at the time the original note was given. There being no dispute about the original note, the payments made on it and subsequent renewals, and the balance remaining unpaid on it, we shall limit our statement of the evidence to those matters essential to a discussion of whether the transaction was an *ultra vires* act of the defendant corporation.

The Crystal Ice and Fuel Company was a Kansas corporation, with a capital stock of $140,000, divided into 1,400 shares of $100 each. Its minute books show the following: On October 20, 1930, there was a special meeting of the stockholders at which 1,073 shares were represented, the meeting being held in response to notice that its purpose was to authorize "the reduction of the capital stock from $140,000 to $105,000, and the purchase of stock and for the transaction of such other business as may come before the meeting." At this meeting the president advised that the bank held 248 shares of the stock of the company as collateral and desired to sell the same at $90 per share, and that it agreed to accept a note of the company and surrender the stock. No action was taken and the meeting adjourned to October 27, 1930. At the adjourned meeting

the following resolution was offered and adopted by a vote of 941 shares for and 120 shares against:

"*Resolved:* That the charter of the Crystal Ice and Fuel Company be amended to reduce the capital stock of said company from $140,000 to $115,200; and

"*Be it further resolved,* That president and secretary or manager of this company be authorized to purchase the 248 shares of stock owned and held as collateral by the Security National Bank at $90 per share and to execute and deliver note of the company for the purchase of said stock."

Immediately thereafter, O. L. O'Brien, trustee, filed his objections to the adoption of the resolution, the objections being later shown. This meeting was adjourned to November 24, 1930, and at the adjourned meeting a similar resolution, except that reduction of capital was from $140,000 to $114,600, and the authorization was to purchase 254 shares instead of 248 shares, was adopted by a vote of 941 shares in favor. There is no showing that any dissenting vote was cast. The minutes of the two previous meetings were read and approved. At the subsequent annual meeting of the stockholders on February 5, 1931, the minutes of the meeting of November 24, 1930, were read and approved. The objection of O. L. O'Brien, trustee, hereinbefore mentioned, was as follows:

"October 27, 1930.

"*Crystal Ice and Fuel Co., Independence, Kan.:*

"Gentlemen—At a meeting of certain creditors of George T. Guernsey, Sr., for whom I am acting as trustee, it was voted that the stock of this company which stands in my name as trustee should be voted against the proposition submitted to purchase the stock of the Security National Bank, which matter comes up at this time. Therefore, I have voted against the proposition.

"Also, according to the instructions of said creditors I hereby protest against the purchase of said stock by said company and hereby give notice that any action on the part of the company to that end will be resisted."

On December 18, 1934, the board of directors adopted a resolution to borrow $15,000 to be secured by a first mortgage on its real estate and equipment. Following the meeting of October 27, 1930, and on October 28, 1930, the company paid to the bank the sum of $2,320 in cash, and delivered to the bank its note for $20,000 due in six months, and received the certificates of stock for 248 shares of its stock. We need not detail the series of renewal notes, the last of which is that alleged in plaintiff's petition.

The demurrers of the company and O'Brien to the above evidence were sustained and, without further proof, judgment was rendered holding the transaction to be *ultra vires* on the part of the company

and canceling and rescinding it, ordering the bank to deliver to the company the note sued on, and rendering judgment in favor of the company and against the bank for $17,970.46, being the amount of payments made by the company to the bank with interest to the date of judgment, and for interest on the judgment and for costs.

Plaintiff appeals to this court, assigning many errors. We shall discuss only those pertaining to whether the transaction was *ultra vires* on the part of the company. Space forbids a discussion of the many authorities cited in the briefs of appellant and appellees. We must content ourselves with those hereafter mentioned.

While the weight of authority is that a corporation, without express authority and when not prohibited by charter or statute, may buy and sell its own shares, if done in good faith (5 Thompson on Corporations, 3d ed., 951; 6 Fletcher Cyc. Corp., Perm. ed., § 2848; 14a C. J. 275; 7 R. C. L. 548; and note in L. R. A. 1916F, p. 286), the rule in Kansas is to the contrary. The rule in Kansas seems first to have been declared in *Savings Bank v. Wulfekuhler,* 19 Kan. 60, where it was held:

"A bank organized under the laws of Kansas cannot purchase its own stock, except in some cases for the purpose of securing a previously existing debt." (Syl. ¶ 3.)

The above rule was followed in *Abeles v. Cochran,* 22 Kan. 405, where stock in the same bank was involved.

In 1897 the banking act was revised, and under Laws 1897, ch. 47, sec. 11 (since amended and now appearing as G. S. 1935, 9-111), a bank was prohibited from purchasing its shares except in specified instances. This statute was under consideration in *Bank v. Strachan,* 89 Kan. 577, 132 Pac. 200, a suit to enforce statutory liability. The defense was that Strachan had assigned his shares to the bank in settlement of his debt to it prior to its insolvency. In that case it was said:

"It may well be doubted whether, in the absence of a statute granting the power, there is authority in a corporation to purchase its own capital stock. (*Savings Bank v. Wulfekuhler,* 19 Kan. 60; *Bank v. Telephone Co.,* 88 Kan. 287, 128 Pac. 357; Note, 61 L. R. A. 621.)" (p. 579.)

In *Steele v. Telephone Association,* 95 Kan. 580, 148 Pac. 661, validity of bylaws compelling a shareholder to sell his stock to the corporation was under consideration, the suit being in mandamus to compel transfer of stock to a purchaser other than the corporation.

In discussing the power of the corporation to buy its own stock a review of our statutes was made, and it was said:

"In the early case of *Savings Bank v. Wulfekuhler*, 19 Kan. 60, the power of a bank to purchase its own stock except to secure a previously existing debt was denied. There are special reasons why a bank should not be allowed to deal in its own stock, but section 1742 was cited as a prohibition upon the power of the bank, and that section is universal in its terms. It applies equally to all corporations which may be created under the general corporation law. The result is that the law will have to be changed before the court is at liberty to recognize the general power of any corporation to purchase its own capital stock." (p. 590.)

and the court held:

"The statutes of this state forbid private corporations organized under the statute referred to to purchase their own capital stock unless necessary to obtain or secure payment of debts or dues owing the corporation." (Syl. ¶ 2.)

In *Kelly v. Insurance Co.*, 101 Kan. 91, 165 Pac. 806, L. R. A. 1918C, 1170, the question was the right of a corporation to purchase shares which it discovered were issued in excess of its authorized capital. It was stated that whether the purchase of its own stock by a corporation is positively forbidden by statute or by mere judicial disapproval, the rule prohibiting a corporation from doing so is based on sound public policy, but it was held the purchase of shares issued in excess of its authorized capital was not a breach of any rule of public policy governing the manipulation of its own stock.

The case at bar presents, however, an element not considered in any of the above cases, and that is, the effect to be given to the proposed reduction of the capital of the company, to accomplish which the stock was purchased.

Under G. S. 1935, 17-215, any corporation may amend its charter in any of its parts by the affirmative vote of two thirds of its shares of stock at a meeting of the stockholders called for that purpose, and under G. S. 1935, 17-217, when the capital is decreased certain publications must be made, and under G. S. 1935, 17-622, the certificate of decrease must be filed with the secretary of state. There is no statutory provision as to the method in which the decrease must be accomplished; that is, whether all shares must be called in and re-issued on a percentage basis, or may be retired by lot, or may be purchased from those willing to sell, or some other prescribed way. Authority to reduce capital stock and methods of accomplishing

reduction have been discussed on numerous occasions. In 14 C. J. 498 (Corp. § 737) it is stated:

"A reduction of the capital stock can take place only in the manner and under the conditions prescribed by the statute or the charter or articles of incorporation, and a strict compliance with the statutory regulations is necessary. A corporation authorized to reduce its capital stock may do so by purchasing its own shares and canceling or retiring them; but, as we have seen, the mere purchase by a corporation of its own shares will not operate as a reduction of stock unless so intended. . . ."

And in the same text (§ 744, p. 503) it is said:

"An attempt to reduce the capital stock of a corporation which is unauthorized either because there is no power at all to make the reduction, or because it is made under conditions or in a manner not permitted by the charter or statute, or an agreement for such reduction, is void both as against the corporation and its stockholders and as against creditors. . . . Mere irregularities, however, in proceedings to reduce capital stock under charter or statutory authority will not affect the validity of the reduction, particularly as against third persons who have in good faith acted on the apparent regularity of the proceeding."

Reduction of capital and means of accomplishing it are also discussed in 5 Thompson on Corporations, 3d ed. In section 3686 it is stated that reduction can only be made under statutory authority, in section 3687 that there can be no implied authority to reduce, and in section 3689 methods of accomplishment are discussed, and it is there said:

"Where the statute permits a reduction of capital stock, but provides no method for reducing it, the corporation may reduce its capital stock by buying up the shares of a single shareholder, or a portion of the shareholders, and canceling the shares thus retired. Where a corporation is authorized to reduce its capital stock, it may do so by purchasing and retiring a part of its shares. Where, under a statute authorizing a corporation to diminish its capital stock, a solvent corporation, authorized by vote of its stockholders, purchased the stock of a stockholder, paying him therefor his pro rata share of the assets of the corporation, it was held to be a valid transaction, and that a subsequent creditor was not prejudiced thereby." (p. 519.)

The subject is also treated in Fletcher Cyc. Corporations (Perm. ed.). With reference to purchase or acquisition of shares by the corporation, the rule is stated in volume 11, section 5148, as follows:

"It is the majority rule that the purchase or acquisition of its own shares by the corporation is not in itself a reduction of the capital stock but that whether or not it has that effect depends on the circumstances and intent with which the shares are acquired." (p. 258.)

And in commenting on that rule it is said:

"When a corporation is authorized to reduce its capital stock it may do so by purchasing its shares and canceling or retiring the same." (p. 261.)

And in volume 19, section 9057, will be found a discussion of the practical problems involved in the reduction of stock, wherein is the following:

"Where, however, the capital stock is to be reduced and there are no un-issued shares or shares in the treasury, the shares to be retired must be obtained in some way from the stockholders. Most of the statutes providing for reduction of capital stock will require that such shares be purchased from the stockholders by lot, at the redemption price, if such a price is fixed in the charter, or, if there be no fixed redemption price, at par, in the case of par-value shares and at the capital-stock value of the same on the corporation's books in the case of no-par shares. Some statutes will permit shares to be purchased for the purpose of such reduction, if they can be obtained at a price lower than the redemption price, but other statutes will be emphatic in providing that the selection of the shares which are to be retired must be by lot, unless the retirement is of the whole amount outstanding of any class of shares. Where the statute makes no provision for the method of retirement, such method should be specified in the resolution of the stockholders under which the reduction of stock is authorized. A method which would be fair both to the corporation and to the stockholders would be that the corporation call on the stockholders for tenders of stock for sale to the corporation at prices less than par or at less than the redemption price if the charter provides for a premium on redemption. If sufficient tenders were received the corporation would make the purchase from the stockholders who tendered at the lowest prices. If sufficient tenders were not received the corporation would call by lot the number of shares needed to effect the reduction." (p. 249.)

In 44 A. L. R. 11 *et seq.* is an annotation on reduction of capital stock, etc., treating many phases of the problem.

As has been shown, our statute authorizes reduction of capital. It does not provide the method by which that reduction is to be accomplished. The resolution for decrease was adopted by the requisite statutory vote, but the stockholders, in the resolution, provided no method for its accomplishment. It is a fair inference the reason they did not do so was because the bank was willing to dispose of its shares for less than par, and no other stockholder, except the trustee, was objecting to the reduction being accomplished in that manner. We are of the opinion that where proper steps are taken to decrease the capital stock of a corporation, and where the resolution for the decrease provides no method for retirement of shares, and where one or more stockholders are willing, at an agreed price, to surrender a sufficient number of shares to accomplish the

reduction, and there is no objection to the reduction being accomplished in that manner, the corporation may not thereafter urge that the purchase by it of the shares so surrendered was an *ultra vires* act.

Neither can it be said that any failure of the company or its officers, after adoption of the resolution for reduction and the purchase of the bank's shares, to make the requisite publications under G. S. 1935, 17-217, or to file the requisite certificate with the secretary of state under G. S. 1935, 17-622, relieved the corporation. It started a proper course of procedure, and obtained from the bank the shares the bank held. The bank had no obligation or duty to see that the company completed the amendment of its charter, and the company cannot now be heard to say it was without power to purchase the bank's shares to reduce its capital, because it did not fully comply with the pertinent statutes.

The trustee argues that he is in position to complain because he protested the action of October 27, 1930. We are not now concerned with the allegation of his answer that at the stockholders' meeting he verbally protested the agreement to purchase the stock would be an *ultra vires* act. We are concerned with the written protest he filed, and which is in evidence. That protest placed the reason for his adverse vote on the ground that his beneficiaries directed him to vote that way. It raised no question of *ultra vires* act, but gave notice that any action on the part of the company in purchasing the stock would be resisted. Whatever may have been the reason for making the protest, the trustee was present at the meeting and aware of the action taken. While in his answer the trustee alleges he has not ratified or approved the transaction, with full knowledge of what was done, and notwithstanding his written notice he would resist the action, he waited from October 27, 1930, until April 20, 1936, to take any affirmative action. It is useless to argue the situation of the parties did not change in the meanwhile. The record shows the bank has gone into the hands of a liquidating agent, and that the company has mortgaged its plant since the above transaction was had. The trustee has been guilty of laches.

And finally, it may be observed that insofar as the bank is concerned, it had performed when it delivered its stock to the company and received the cash payment and the first note. So far as it is concerned, the contract was executed. In *Harris v. Gas Co.*, 76 Kan. 750, 92 Pac. 1123, an attempt was made by collateral inquiry to

question the power of a corporation to make a certain oil and gas lease on the ground the charter did not permit. The opinion contains an exhaustive review of the effect of an *ultra vires* act, and who may question it, and concludes:

"No Kansas statute declares that a contract made by a corporation in excess of its legitimate powers shall be void, or in terms permits the question of corporate capacity to be raised by one of the parties. Where it is held that no recovery can ever be had upon an *ultra vires* contract, as such, whatever relief is afforded is logically made to turn upon whether and how far the agreement has been acted upon. Where a recovery is sometimes permitted under the contract itself, upon the principle of estoppel, the question whether it has been carried out is likewise of manifest importance, there being a difference in degree at least between the attitude of one who has merely entered into an engagement in expectation of obtaining an advantage from it and that of one who has actually reaped its benefits in whole or in part. But the doctrine that only the state can challenge the validity of acts done under color of a corporate charter, if accepted, must necessarily protect an executory contract from collateral attack equally with one that has been executed. The court is convinced of the soundness of the view that in the absence of special circumstances affecting the matter neither party to even an executory contract should be allowed to defeat its enforcement by the plea of *ultra vires*. The doctrine is logical in theory, simple in application, and just in result. It of course does not apply to contracts which are immoral or which are illegal, as distinguished from merely unauthorized, or to those made by public corporations. Nor does it forbid interference by a stockholder to protect his rights as such." (p. 763.)

In *Kelly v. Insurance Co.*, 101 Kan. 91, 165 Pac. 806, L. R. A. 1918C 1170, it was said:

"There are, indeed, two schools of jurists and two lines of authority on legal questions relating to *ultra vires* transactions. The case of *Harris v. Gas Co.*, 76 Kan. 750, 92 Pac. 1123, discusses at length both the strict and the liberal view concerning the consequences of *ultra vires* transactions. A long line of well-considered decisions has committed this court to the liberal view that a corporation may not avoid its obligation on a plea of *ultra vires* when it has appropriated the consideration or received the benefits of it, and when the party seeking to enforce the obligation has fully performed his share of the undertaking." (Citing many cases.) (p. 98.)

And in *Tennant v. Long*, 138 Kan. 132, 23 P. 2d 477, it was held:

"Rule followed that a defense of *ultra vires* cannot be successfully interposed by a corporation to an obligation incurred in its behalf when the other party to the transaction has parted with a consideration which the corporation has received and retains, notwithstanding the possible want of authority on the part of the officer who acted for the corporation." (Syl. ¶ 2.)

It must be held that the evidence disclosed a situation where the

company was estopped to rely on the defense that its acts were *ultra vires*, even if it be conceded they were.

It follows the trial court erred in sustaining the demurrers to plaintiff's evidence, and in later rendering judgment in favor of the defendant company and against the bank. Having reached this conclusion, we are confronted with whether the cause should be remanded for further proceedings or final judgment should be ordered. While ordinarily an erroneous ruling sustaining a demurrer would necessitate remanding the cause for rehearing, here we are confronted with the fact that even though defendants fully proved the allegations of their answers, such proof would not establish a defense to the liability proved by the plaintiff's evidence. In such case a new trial would be a futility. (*Manufacturing Co. v. Porter*, 103 Kan. 84, 88, 172 Pac. 1018; *McClure v. Irwin*, 138 Kan. 35, 23 P. 2d 470.)

The judgment and order of the trial court is reversed and the cause is remanded with instructions to the trial court to render judgment in favor of the plaintiff.