No. 33,721

JOE STUMPH, *Appellee* and *Cross-appellant*, v. THE WHEAT BELT BUILDING AND LOAN ASSOCIATION OF PRATT, *Appellant.*

(79 P. 2d 896)

Opinion filed June 11, 1938.

*John L. Hunt, Margaret McGurnaghan, John H. Hunt* and *George M. Brewster,* all of Topeka, for the appellant.

*William Barrett, George Barrett* and *Robert G. Miller,* all of Pratt, for the appellee.

The opinion of the court was delivered by

THIELE, J.: This was an action to compel release of a mortgage and to recover statutory damages and attorney's fees because of the mortgagee's refusal to release.

On March 28, 1922, Jessie J. Steward and her husband borrowed $3,000 of the defendant, hereafter referred to as the association, securing the same by a mortgage on real property in Pratt county, Kansas. When the loan was made, in accordance with the statutes applicable to building and loan associations, the borrowers purchased from the association thirty shares of class G installment stock, evidenced by a certificate which will be referred to later in more detail. This stock was pledged for payment of the debt. At the same time, the borrowers executed and delivered to the association a note reciting that on maturity of the stock pledged they would pay the association the $3,000 advanced, with interest at the rate of ten percent per annum payable monthly on the 25th day of each month until the principal sum had been fully paid, and that they pledged and assigned to the association as collateral security the capital stock evidenced by the above-mentioned certificate and that they agreed to pay the monthly dues on the stock amounting to $10.80 and the monthly installments of interest amounting to $25.20, together with all fines chargeable upon arrears.

"Until such time as said stock shall reach the ultimate value thereof and fully mature and be fully paid in and of the value of $100 per share, according to the terms and provisions thereof, and of the said constitution and bylaws; when, if all the terms and conditions of this note and the mortgage securing the same, have been fully complied with, such stock shall be accepted by said association at its face value, in settlement of this note and the said loan and indebtedness; unless said loan shall be otherwise sooner paid, canceled and discharged."

To secure payment of this note the borrowers executed and delivered to the association a mortgage describing the above note and reciting:

"The first parties expressly agree that they will pay to second party, or its

successors or assigns, on or before the fifteenth day of each month, the sum of $10.80 as dues on thirty (30) shares of class G installment stock certificate No. 90 of said association assigned and pledged as collateral security to said association, and the sum of $25.20 as interest on said sum of $3,000 and also fines that may be assessed against said stock until said stock shall become fully paid up and of par value of one hundred dollars per share under the provisions of the constitution and bylaws of said second party, and to secure the performance of all the terms and conditions expressed in said promissory note."

The stock certificate above mentioned, in general, complied with the requirements of Laws 1911, ch. 131, sec. 2, then in force, and showed that Jessie J. Steward was the owner of class G shares of the capital stock of the association and that it was issued in accordance with the following provisions of the bylaws, which, in part, were as follows:

"Class G Installment Stock

ARTICLE VI

"Sec. 8. Class G installment stock shall be issued only to members desiring loans upon real estate, upon the association's *definite contract plan* and shall be dated the day of the month in which issued. The stockholder shall be required to make monthly payments as stated in the following table, and at the expiration of the number of months specified therein his stock shall be due, and the proceeds thereof shall be applicable for the payment of the loan for which they were given as security. Excess payments permitted on class G shares, the same to participate in dividends in the same proportion as regular payments. (Italics ours.)

"Table of Monthly Rate for Each Share of $100

| Terms of payments | Payment monthly | 144 months | .38 |

"The power is given the board of directors to change the above payments when deemed for the best interest of the association; such change, however, shall not affect outstanding certificates in this class."

The following paragraph also appeared on the certificate:

"In consideration of a guarantee by the holders of the permanent stock to declare dividends at a rate sufficient to mature this certificate within the term prescribed, and the guaranteed withdrawal privileges, the holder hereof hereby agrees to waive his right to any earnings in excess of the amount necessary to realize such guarantee."

On the back of the certificate was endorsed:

"Number 90  Class G.
Number of Shares, 30; $3,000; Year, 12; Series in. . . ."
"Issued to Jessie J. Steward; Date, 3-28-22  Address———.
Read your certificate. It is your contract with the association."

Sometime thereafter, Mrs. Steward and her husband sold the real estate to one Walter E. Baker, and at that time assigned their in-

terest in the building and loan stock to him. Baker continued to own the property until about January, 1933, when he sold it to the present plaintiff, to whom the building and loan stock was transferred. The plaintiff made payment of the monthly installments of $36, and on May 3, 1934, he made payment of the 144th installment due and demanded release of the mortgage. Without reciting the details here, the association refused to release the mortgage, claiming that the pledged stock was not matured to its face value, and that there was a balance due and owing on it to make it worth its par value of $100 per share. On October 31, 1934, the plaintiff brought his action to compel release. The association answered that the note secured by the mortgage had not been fully paid according to its terms, the bylaws of the association and the statutes of the state of Kansas, and that a balance remained due and unpaid; that the stock certificate, note, mortgage and bylaws did not guarantee the loan would be fully paid upon payment of 144 monthly installments of $10.80 each and 144 monthly installments of $25.20 each, but in order to fully pay the indebtedness it was necessary that dividends be declared and credited to the holder; that the certificate provided for payments in the sum of 38 cents per month on each $100 share, or a total of .$11.40 per month, but that plaintiff paid only $10.80 per month, and that owing to the unprecedented financial conditions and the depression, said association did not pay dividends to the holders of this or any other class of stock for the two years last past, and that by reason thereof the stock has not fully matured, and—

"That any attempted guarantee in said stock was made only by the holders of the permanent stock of said association and not by said association, and that said association could not under and by virtue of the laws of the state of Kansas guarantee the maturity of said stock, and any attempted guarantee would be *ultra vires* and void."

The answer further alleged that the note was unpaid and unsatisfied; that the stock had not matured, and the plaintiff was not entitled to cancellation or release of the mortgage.

Other allegations of the petition and of the answer and such statements of fact as the evidence disclosed will be referred to later where necessary. It may be observed, however, that at the trial, evidence was taken covering a rather wide range. At the conclusion, the trial court made eighteen findings of fact, four conclusions of law based thereon, and also prepared a memorandum opinion, which is in-

cluded in the abstract. Its conclusion was that the note, mortgage, stock certificate and the bylaws of the association constituted a contract between the plaintiff and the association, and that if the contract was *ultra vires* on the part of the association it was estopped from asserting invalidity; that the plaintiff was entitled to judgment for cancellation of the mortgage, but was not entitled to statutory damages or attorneys' fees.

Various post-trial motions of both parties, including motions for a new trial, with one slight exception, were denied. Defendant appeals, assigning sixteen claimed errors. Plaintiff includes in his brief a cross-appeal, because he was denied statutory damages and attorney fees.

Before taking up what we believe are the decisive features of the appeal, we note appellant's contention that the amount of dues called for by the note, *i. e.*, $10.80 per month, or 36 cents per share per month, was at variance with the requirements of the bylaws, which fixed the rate at 38 cents per share per month. The same bylaw, however, gave the board of directors the right to change the rate. The evidence showed they approved the loan as made. It is fruitless to discuss this phase of the matter further.

For purposes of discussion, we shall assume the certificate of stock, the bylaws of the association as noted thereon, the note and the mortgage constituted the contract between the association and the plaintiff, and that by reason of article VI, section 8 of the bylaws as quoted above, the original parties intended the pledged stock should be matured and applicable to the retirement of the loan when the 144th monthly payment was made in due course of time. To determine correctness of that assumption it is necessary to inquire whether a building and loan association may validly so contract. Prior to the enactment of Laws 1911, ch. 131, the statute, with reference to classes of stock which could be issued (G. S. 1909, § 1860), used the expression "permanent or guarantee stock." The 1911 amendment, hereafter quoted in part, eliminated the words "or guarantee," but did not otherwise materially change the provisions with reference to that class of stock. The name, rather than the characteristics of this class of stock, was changed. With respect to guarantee stock, in Sundheim on Building and Loan Associations, 3d ed., § 17, it is said:

"Guarantee stock is a fixed nonwithdrawal investment which guarantees to all other investors in the association a fixed rate of dividend or interest. *Under*

*this plan all other kinds of shares may be issued by the association, the holders of which know in advance the return their saving will yield, and the borrower knows the exact time of the maturity of his loan and the exact cost.* This guarantee stock must be replenished in case of impairment. In return for the risk involved those who supply this capital receive all the earnings of the association over and above the amount required to pay dividends to other classes of stock and have actual control of the affairs of the association. The association may not loan any of its funds upon any of its own guarantee stock as security. The issuance of this kind of stock must be expressly authorized by statute." (Italics ours.)

The loan in question was made in March, 1922, at which time the statutes in force with reference to building and loan associations were somewhat different than as now appear in the 1935 General Statutes. And in discussion of the power of an association to enter into a definite contract, it should be noticed there are some differences between contracts to pay definite dividends on certain types of stocks and contracts for maturing stocks pledged for loans. G. S. 1915, § 2214 (being Laws 1911, ch. 131, § 2), then in force, provided that:

"Any such corporation may also issue permanent stock . . . upon which permanent stock a full dividend, or a definite dividend, may be paid, which dividend shall in no case exceed the percent of profit per annum acquired by any other class or series of stock at the time such dividend is declared. The balance of profits (if any) and the principal paid on said stock shall not be paid to the holders of the same until all lawful claims of every other class of stock in its series, as expressed in the certificate of such other classes, and all other liabilities of such corporation, shall have been fully liquidated and paid."

Under G. S. 1915, § 2219, loans might be made on all classes of shares, except permanent shares, under the conditions there set out. And under Laws 1915, ch. 96 (G. S. 1915, § 2258 *et seq.*), provision was made for issue of rural-credit shares, on which a definite rate of interest might be paid. No specific provision for a definite dividend on any other class of stock was made in the statutes, although it is well known that as a matter of common practice a definite rate of interest was contracted to be paid on full-paid stock. Some of the statutory provisions with reference to maturity of stock (G. S. 1915, §§ 2214, 2219, 2223) would seem to indicate that it would mature only when the dues and dividends reached the ultimate and full value thereof. It should be noted, however, that there is no specific prohibition against a definite contract of maturity and that certain of the statutory language would indicate the matter might be controlled by the bylaws, all of which, at the time in question,

were subject to approval of the bank commissioner (G. S. 1915, § 2211). A specific instance is G. S. 1915, § 2214, wherein it is provided that the object of the corporation shall be the accumulation of capital by payments from the members "at such times and in such manner as may be provided in the bylaws." And "payments of dues or installments on shares shall commence and date from the time provided in the bylaws." In section 2220 it is provided that—

"In case any borrowing shareholder shall for the period of six successive months fail to pay the dues, interest, fines and other charges required of him by the bylaws," etc.

In section 2223 it is stated:

"Each shareholder shall pay to said corporation, at or before each stated meeting of the directors, or at any such time as may be provided in the bylaws, as a contribution to the capital thereof, the sum fixed as dues for each and every share held by him, until each share shall, under the provisions of this act, reach the face value thereof:" etc.

And other similar provisions are found in the statute.

Appellant contends, however, that building and loan associations are fundamentally mutual organizations, and that to hold the association could enter into a contract definite as to the number of payments required of a borrowing member would be to hold contrary to their aim and purpose, would take away mutuality, would result in preference, and would be an *ultra vires* act of the association. Among other decisions, appellant directs our attention to *Brollier v. Bankers Mortgage Co.,* 137 Kan. 298, 20 P. 2d 817, as holding that mutuality is a basic feature of a building and loan association. The case does so hold, and that is generally true. But in that case the question at issue was whether the defendant company's securities were subject to withdrawal and retirement under the building and loan laws of this state. The question of the effect of the issuance of permanent stock and the power of the association to loan money on definite term contracts was not in issue and was not discussed.

In Sundheim on Building and Loan Associations, 3d ed., § 21, it is said:

"One of the principal and distinctive features of a building association is mutuality. However, mutuality does not mean that every member or shareholder should receive the same return on his investment, or have the same rights. It means that every member in the same class, or holding the same kind of stock, or certificate, must have the same benefit or liability or right, whether the stock be free, or whether an advance has been made upon its security. . . ."

And in *Bertche v. Loan & Inv. Ass'n of Mo.*, 147 Mo. 343, 48 S. W. 954, a leading case on the subject, it was held that a fundamental law of building and loan associations is mutuality; that all members must participate equally in profits and must share losses, if any, in the same proportion, and that therefore a loan contract that purports to have stock mature as the result of a definite number of payments made is *ultra vires* and void. This case has been often cited and followed. It is to be observed, however, that in the association there involved there seems to have been no class of stock comparable to the permanent stock authorized by the Kansas statutes.

On the other hand, it has been held in many cases that if the statutes do not prohibit, an association may make a definite contract. A reference to the authorities shows there is a great deal of conflict. In 9 Am. Jur. 153 (B. & L. Ass'ns, § 66) it is said:

"There is a conflict in the cases as to the right of the borrower to a cancellation of the loan at the expiration of the time fixed for maturity of the stock where it has not reached its par value. This is sometimes, but not always, due to a difference in the bond, note, or mortgage given, in the bylaws or constitution of the association, or in the statutes governing the associations. In a considerable number of cases the right to have the loan canceled has been sustained, sometimes on the ground that a provision fixing the time for maturity is proper, sometimes on the ground that although a building and loan association could not properly make an agreement that its stock will mature at a fixed time or after a specified number of payments it is estopped, after having induced persons to deal with it and to borrow from it in reliance upon such an agreement, to deny its power in this respect, and in some instances on the ground that the transactions involved lacked some of the elements of mutuality characteristic of the affairs of true building and loan associations.

"On the other hand, numerous cases have denied the right of the borrower to have the par value of his stock applied in cancellation of the loan at the expiration of the fixed period unless the stock has actually matured at or prior to that time. Among the reasons given for such denial is that to hold otherwise would cast the entire burden of losses upon the nonborrowing members; that an agreement of this character is *ultra vires* and void; that the provision fixing the time of maturity was a mere estimate or expression of opinion, and not binding on the association; and that conflicting provisions in the mortgage, bylaws, or statute requiring payments to be made until the stock actually matures must be given effect. In a few cases provisions limiting the number of payments to be made on stock have been held to relieve the holder of the duty of making further payments of dues, but not to entitle him to have the stock applied at par in payment of the loan."

In addition to other authorities there cited are annotations in 98 A. L. R. 6, and 98 A. L. R. 89, covering many phases of the rights of shareholders in settlement of their rights in building and loan associations. And see 9 C. J. 935 (B. & L. Ass'ns, § 31).

It is to be observed, however, that our statute in effect authorizes two types of associations, those without and those with permanent stock. In theory, at least, in an association without permanent stock, all profits from operations are ultimately to be declared as dividends to all shareholders entitled to participate, and the association is without power to treat one class of shareholders differently from another, except as specifically authorized by statute. Where there is permanent stock, however, the statute does not seem to contemplate necessity for the directors to do more than declare sufficient dividends of profits to mature shares in specified periods; that is, if the earnings would justify declaration of dividends sufficient to mature stock ahead of the specified time, there is no requirement that it be done, for if it were required to be done, that portion of G. S. 1915, § 2214, with reference to permanent stock, reciting, "the .balance of profits (if any) and the principal paid on said stock shall not be paid to the holders of the same," etc., would be meaningless. If every shareholder of every class must pay the stipulated number of payments, and then if sufficient dividends have not been declared to have his stock fully matured must await the pleasure of the board until there have been additional earnings and declared dividends, the result would be to create an unjust preference in favor of the permanent shareholders. Neither is it now important what ratio existed between the permanent stock and the other classes of stock to be issued. This was all to be determined by the bylaws which had to be approved, at the time the loan here was made, by the bank commissioner. If that official thought the ratio too small, it was within his power to withhold approval.

At the time the loan in question was made, G. S. 1915, § 2212, was in force, and under it the qualifications of electors could be fixed by the bylaws. We need not pause to determine their validity, but under article II, section 3 of the bylaws of the present association, the right to vote seems to have been conferred on the holders of the permanent stock, and by article II, section 1, membership on the board of directors was limited to holders of permanent stock. Thus actually control of the association was in the permanent stockholders and mutuality was to a degree lacking.

Nor is it at all clear the legislature believed it was providing for purely mutual organizations, for in G. S. 1915, § 2229, which was Laws 1899, ch. 78, § 21 (an act making rather comprehensive provisions for building and loan associations), it was provided that:

"Any *mutual* building, loan and savings association heretofore organized under the laws of this state shall have power to provide for the transaction of future business under the provisions of this act . . . the stockholders shall have the power . . . to change, alter or repeal their present constitution and bylaws and adopt such new constitution and bylaws as they may deem needful for their future government, provided they do not conflict with the laws or constitution of this state," etc. (Italics ours.)

Viewed from one angle, it would seem a mutual association might by alteration of constitution and bylaws become one not mutual. Both parties direct our attention to *Hogsett v. Loan Association*, 78 Kan. 71, 96 Pac. 52, and quote certain portions from it in support of their contentions. In that case the question for decision was with respect to preferences among stockholders in respect to stock issued prior to the comprehensive revision of our building and loan laws in 1899. No good purpose will be served by an analysis of that case, but it may be observed there is nothing there stated that is contrary to our conclusions here.

In view of the fact the statute contains no prohibition against a building and loan association's issuing a definite term loan contract, in view of the statutory provisions with reference to the issuance of permanent stock, limited as to dividends but authorized to take the profits, if any, we are of the opinion that it is not beyond the power of an association having permanent stock, to issue loan stock payable in a stipulated number of months and to enter into a loan contract under which the stock is assigned and pledged as security.

Were we in doubt as to the power of the association to enter into a definite payment contract, we would still be confronted with the question whether it is not now estopped to raise the question. We shall content ourselves by quoting the view expressed in *Vought v. Eastern Bldg. & Loan Ass'n*, 172 N. Y. 508, 65 N. E. 496, 92 Am. St. Rep. 761:

"The only remaining question we deem it necessary to consider arises upon the contention of the defendant that it was unauthorized by the statute under which it was organized to make the contract in suit, and, hence, the plaintiff cannot recover. . . . We deem it unnecessary at this time to determine whether the defendant was authorized by that statute to enter into such contracts, for if we assume that the making of them was in excess of the express power conferred upon the corporation by that statute, still, as the contracts involved no moral turpitude and did not offend any express statute, they were not illegal in a sense that would prevent the maintenance of an action thereon. It is now well settled that a corporation cannot avail itself of the defense of *ultra vires* when the contract has been, in good faith, fully performed by the

other party, and the corporation has had the benefit of the performance and of the contract. As has been said, corporations, like natural persons, have power and capacity to do wrong. They may, in their contracts and dealings, break over the restraints imposed upon them by their charters; and when they do so their exemption from liability cannot be claimed on the mere ground that they have no attributes nor facilities which render it possible for them thus to act. While they have no right to violate their charters, yet they have capacity to do so, and are bound by their acts where a repudiation of them would result in manifest wrong to innocent parties, and especially where the offender alleges its own wrong to avoid a just responsibility. It may be that while a contract remains unexecuted upon both sides, a corporation is not estopped to say in its defense that it had not the power to make the contract sought to be enforced, yet when it becomes executed by the other party, it is estopped from asserting its own wrong and cannot be excused from payment upon the plea that the contract was beyond its power." (p. 517.)

ending citing authorities. On the general question of estoppel of a corporation to raise the question of its acts being *ultra vires*, see *Security Nat'l Bank v. Crystal Ice & Fuel Co.*, 145 Kan. 899, 907, 67 P. 2d 527, and the cases therein cited.

Our conclusion renders it unnecessary to refer to many of the findings of fact and the evidence on which they are based, and the arguments of appellant based thereon. With reference to the cross-appeal, whether the appellee was entitled to statutory damages and attorney's fees depended in large part on there being a *bona fide* controversy between the parties. The trial court held against the association, but that did not mean there was no claim in good faith by it. The controversy grew out of a matter on which other courts had decided both ways and on which this court had not ruled. We think that under *Parkhurst v. National Bank*, 53 Kan. 136, syl. ¶ 3, 35 Pac. 1116, the trial court's ruling was correct.

The judgment of the lower court is affirmed.

HARVEY, J., not sitting.